10-3604-cv
*Zeno v. Pine Plains Cent. Sch. Dist.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2011

(Argued: October 21, 2011    Decided: December 3, 2012)
Docket No. 10-3604-cv

_____

ANTHONY ZENO,

*Plaintiff-Appellee,*

v.

PINE PLAINS CENTRAL SCHOOL DISTRICT,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:
        CABRANES, LIVINGSTON, and CHIN, *Circuit Judges.*

Appeal from orders of the United States District Court for the Southern District of New York (Davison, *Mag. J.*) denying defendant-appellant's motion for judgment as a matter of law and granting remittitur of the jury's award of damages pursuant to Title VI of the Civil Rights Act of 1964 to $1 million.

AFFIRMED.

_____

STEPHEN BERGSTEIN, Bergstein & Ullrich, LLP,
     Chester, New York, *for Plaintiff-
     Appellee.*

JOHN FRANCES MOORE, Towne, Ryan & Partners,
     P.C., Albany, New York, *for
     Defendant-Appellant.*

Jay Worona, Pilar Sokol, Latham, New
     York, *for Amicus Curiae New York
     State School Boards Association,
     Inc.*

Thomas E. Perez, Assistant Attorney
     General, Samuel R. Bagenstos,
     Principal Deputy Assistant Attorney
     General, Dennis J. Dimsey, Erin H.
     Flynn, Attorneys, U.S. Department of
     Justice, Charles P. Rose, General
     Counsel, Department of Education,
     Washington, District of Columbia,
     *for Amicus Curiae United States.*

_____

CHIN, *Circuit Judge*:

During his freshman year of high school,
plaintiff-appellee Anthony Zeno ("Anthony") transferred to
Stissing Mountain High School ("SMHS") in Pine Plains, New
York.  SMHS was a part of defendant-appellant Pine Plains
Central School District (the "District").  His fellow
students harassed him for the next three-and-a-half years.
He brought this action below, contending that the District

-2-

was deliberately indifferent to his harassment. A jury found the District liable for violating Title VI of the Civil Rights Act of 1964 ("Title VI") and awarded Anthony $1.25 million in damages.

The district court (Davison, *Mag. J.*)[1] denied the District's motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), but it granted remittitur of the jury award to $1 million. The District appeals. We affirm.

## BACKGROUND

### A. *The Facts*

We construe the facts in the light most favorable to Anthony. *See, e.g., Townsend v. Benjamin Enters., Inc.,* 679 F.3d 41, 51 (2d Cir. 2012).

### 1. *Freshman Year (January 2005 -- June 2005)*

In January 2005, when he was sixteen years old, Anthony moved from Long Island to Pine Plains, in Dutchess County. He enrolled at SMHS, a racially homogenous school where minorities represented less than five percent of the

---

[1] Both parties consented to jurisdiction by a magistrate judge.

-3-

student population.  For the several years preceding Anthony's enrollment, SMHS was devoid of bias-related disciplinary incidents.  That changed after Anthony -- who is dark-skinned and biracial (half-white, half-Latino) -- began attending SMHS.

In February 2005, a few weeks after Anthony's arrival, a student -- a stranger to Anthony -- charged toward him, screaming that he would "rip [Anthony's] face off and . . . kick [his] ass," and that "[w]e don't want your kind here."  Other students held the aggressor back, while unidentified students in the crowd called Anthony a "nigger" and told him to go back to where he came from.

After this first incident, Anthony's mother, Cathleen Zeno ("Mrs. Zeno"), voiced her concerns to SMHS principal John Francis Howe.  Howe told Mrs. Zeno that "this is a small town and [] you don't want to start burning your bridges."

For the rest of the year, Anthony was subjected to numerous racial comments and harassment at the school.  For example, a student stripped a necklace from Anthony's neck, breaking it.  The student claimed the incident was merely a

joke and offered an apology: "Whoops, didn't mean to break your piece of fake rapper bling bling."

Anthony repeatedly reported the incidents to school officials. Mrs. Zeno wrote to District Superintendent Dr. Linda Kaumeyer and the school board, raising concerns about students' "verbal racial attacks and physical abuse" on Anthony and his younger sister, who was also a student in the District. Kaumeyer neither offered to meet with Mrs. Zeno nor informed Howe of the letter.

Beyond disciplining each student involved in incidents during this semester with a warning or suspension, the District did not implement other remedial measures in response to the student harassment of Anthony.

2. *Sophomore Year (August 2005 -- June 2006)*

a. *Escalating Harassment*

Throughout Anthony's second year at SMHS, student harassment continued. In addition to the pervasive hallway harassment reported by Anthony, specific incidents revealed escalating racial tensions at SMHS.

For example, a football teammate punched Anthony as he told him that "he was going to kick [Anthony's] black

ass."  Another student, in the cafeteria, told Anthony, "You fucking nigger.  Go back to where you came from."  The student picked up a chair, and started to throw it at Anthony before he was restrained.  On yet another occasion, Anthony walked into the school bathroom to find graffiti on the walls warning:  "Zeno is dead" and "Zeno will die."  Then, in December 2005, another football teammate circulated a homemade rap CD at SMHS.  The CD used racial ("nigger"), anti-Semitic, and sexually-charged language.  Anthony, like many of his peers, received a copy.

Harassment of Anthony continued the following semester.  In January 2006, a faculty member reported frequent racial comments in Anthony's art class.  For example, a classmate repeatedly called Anthony "homey" and "gangster," referred to "the hood," and made stereotypical remarks such as "what's up my nigger" and "you're so ghetto."  Then, in February 2006, the student who had broken Anthony's necklace and another student tampered with Anthony's locker.  When Anthony later opened his locker, the metal door fell off, hitting him on the head.  The students had also filled the locker with garbage, which

-6-

spilled onto Anthony and the floor. Moreover, on at least two separate occasions, students taunted Anthony in a racial manner with references to lynching -- displaying a noose or threatening to take a rope to the nearest tree.

In response to these incidents, the District suspended the students involved, typically for five days. Twice, Anthony obtained Orders of Protection. The District moved one student to another school.

### b. *Additional Reports of Harassment*

During his sophomore year, Anthony faced additional harassment, which he repeatedly reported to school officials. In fact, halfway through the year, he told faculty and staff: "I'm tired of this -- I can't take any more of it, I have to stop this -- This has been going on forever."

Similarly, by letter to Superintendent Kaumeyer dated September 19, 2005, Mrs. Zeno described "verbal attacks includ[ing] racial slurs and threats to their lives" and physical attacks so violent that SMHS called the police. Kaumeyer did not call or meet with Mrs. Zeno, but she responded in writing. Principal Howe responded by

asking staff members and teachers to keep an eye on Anthony and to reach out to him.

In addition, the Zenos' lawyer and members of the community notified the District about the harassment. In October 2005, Marilynn A. Vetrano of the Dutchess County Human Rights Commission (the "HRC") wrote Kaumeyer, referring to "a complaint of alleged racism related incidents." Around this time, Anthony's lawyer, Michael H. Sussman, also contacted the District. Sussman asked SMHS to do two things: (1) provide Anthony with a shadow, who would accompany him at school, and (2) implement racial sensitivity programs to underscore the District's zero tolerance of racism and bias.

In November 2005, Vetrano and Elouise Maxey of the Dutchess County N.A.A.C.P. met with Kaumeyer and with Howe. At both meetings, Vetrano and Maxey reiterated the Zenos' requests for a shadow and racial sensitivity programs. In addition, they offered to provide these options at no cost.

The District, however, declined to assign Anthony a shadow and chose not to implement the HRC's training program.[2]

After meeting with Vetrano and Maxey, Howe discussed Anthony's progress and transition to the District with his teachers. He learned that in Anthony's art class, "[r]acial comments [were made] all the time." In addition, a teacher indicated that Anthony's presence "just makes it worse."

At the end of the school year, the District prepared an Individualized Education Program ("IEP") for Anthony. The IEP noted that "Anthony has been struggling with acceptance in the school environment. There have been numerous incidents between Anthony and others with prejudicial or racial overtones." After the IEP was finalized, Special Education Director Maryanne Stoorvogel (who prepared the IEP), teachers, and other school officials discussed the IEP with Mrs. Zeno. At this

---

[2] The District was considering a program run by McGrath Training Systems. The program ultimately implemented by the District was a one-day program (rather than a series of programs), focused largely on bullying and sexual harassment, and was implemented in February 2006, over three months later.

meeting, Mrs. Zeno also raised additional concerns regarding the bias Anthony continued to encounter at school.

### c.   *Additional District Actions*

Stoorvogel, who was aware of the "numerous incidents . . . with prejudicial or racial overtones" concerning Anthony, never investigated the harassment.  As the District's Title IX compliance officer, Stoorvogel was charged with investigating alleged violations of both Title IX of the Education Amendments of 1972 ("Title IX") and Title VI.[3]  Nevertheless, she did not follow up or respond to these complaints.

Stoorvogel was also part of a group (which included Kaumeyer and other District-wide administrators) that met on a biweekly basis to discuss issues of internal importance.  Throughout Anthony's sophomore year -- even

---

[3]     Title IX of the Education Amendments of 1972 ("Title IX") prohibits discrimination on the basis of sex. 20 U.S.C. § 1681(a).  By contrast, Title VI of the Civil Rights Act of 1964 ("Title VI") prohibits, inter alia, discrimination on the basis of race, color, or national origin.  42 U.S.C. § 2000d.

after the graffiti on the bathroom wall, the comments about lynching, the noose, and other incidents -- the administrators never discussed racial harassment, generally, or Anthony, specifically.

In February 2006, the District coordinated a mediation between Mrs. Zeno and Anthony's antagonists and their respective parents. The District neglected, however, to notify Mrs. Zeno of the date or time of the mediation, and she did not attend. Moreover, the prospective mediator was not trained in bias awareness or diversity, issues at the core of the harassment.

The District also implemented separate one-day programs for faculty and staff, students, and parents, run by McGrath Training Systems. The course was called "Altering the Culture of Cruelty: A Legally Based Bullying and Harassment Prevention Program." The program discussed bullying and sexual harassment, but despite being customized for the District, its treatment of race and discrimination was tangential at best.

The District never implemented discrimination-, bias-, diversity-, or race-specific programs during the 2005-2006 academic year.

3.   *Junior Year (August 2006 -- June 2007)*

In the fall of 2006, Anthony was subjected to more hallway harassment in school.  He reported it to the District less frequently, however, because "[n]othing was being done, and it's been already three years."  Mrs. Zeno again contacted Kaumeyer, by letter dated October 24, 2006, hoping to discuss solutions to her son's continued harassment.  Kaumeyer again did not call Mrs. Zeno or meet with her, but she responded in writing a few days later.

In addition to the hallway harassment, in January 2007, a student threatened to "kick [Anthony's] black ass" and repeatedly threatened to rape his younger sister. Anthony threw a punch.  The District punished Anthony, but not the instigator.  Then, in February 2007, SMHS's drama club planned to reenact a TV show, "Married With Children." When Anthony was assigned his role, another student commented that Anthony would fit the role "if it was like a black gangster."

-12-

Anthony also began spending part of his junior year with the Boards of Cooperative Educational Services ("BOCES") program.[4]  As he travelled to the off-campus program, students on the BOCES bus repeatedly called him a "nigger."  Anthony informed the District about these incidents, but even when a particular student was disciplined, the harassment continued because "if it wasn't the same kid, it would always be someone replacing that kid, because they were all connected."

The District responded by hiring James Childs of JaRa Consulting, who planned to conduct student focus groups, administer surveys, and meet with staff, parents, and community members to increase diversity awareness. Childs was also supposed to train faculty and staff on the importance of acknowledging racial diversity and recognizing racial stereotypes, and to train students on diversity issues.  During the entire school year, however,

---

[4]  The Boards of Cooperative Educational Services ("BOCES") of New York State encourage school districts to collaborate when creating vocational programs.  These programs are shared by students among participating districts.  N.Y.S. Dep't of Educ., *Boards of Cooperative Educational Services (BOCES)*, (Nov. 7, 2012, 2:37 PM), http://www.p12.nysed.gov/mgtserv/boces/.

Childs only did preliminary work and held no training sessions.[5]

The District also reorganized STOP ("Students and Teachers Opposed to Prejudice"), a student extracurricular activity that had been defunded.

### 4. *Senior Year (August 2007 -- June 2008)*

During Anthony's fourth year, he reported fewer incidents of harassment to SMHS authorities. When incidents did occur, however, they were serious. For example, at an SMHS football game in September 2007, a student called Anthony's sister a "slut" and threatened to kick Anthony's "black ass." Anthony and this student began to fight. Anthony's friend tried to intervene and break up the fight when another student suddenly "jumped" Anthony's friend, choking him until he lost consciousness. Off-duty officers broke up the fight. The student who choked Anthony's friend ultimately received a 45-day suspension.

Students continued to call Anthony a "nigger" in the hallways "all the time," and he reported these comments

---

[5] Childs's sensitivity training for students finally took place during the 2007-2008 school year.

-14-

to Howe.  Similarly, he encountered continued racial harassment on the bus to his off-campus BOCES program.

During the 2007-2008 academic year, Childs's preliminary work finally resulted in sensitivity training sessions for students.  Students were randomly selected to participate but could opt out.  The District also instituted "Project Wisdom," which consisted of reading a "short message containing a quotation from a historic figure, celebrity, modern hero, or other notable voice that reinforce[d] the topic of the day."  These messages were read over the school's public address system each morning, and although some messages addressed racism and prejudice, the messages focused primarily on "civic and personal values."

Finally, on two occasions, the District invited Camfel Productions to produce student assemblies addressing character education.  These assemblies focused on respect, bullying, prejudice, and decision making, and also discussed racism and racial harassment.

## B.  *Anthony Accepts an IEP Diploma*

At the beginning of his fourth year, Anthony and his family faced a choice.  Anthony was short of the credits required to graduate.  He was entitled to stay in the District until he turned twenty-one and try to satisfy the Regents diploma requirements.  Based on his historic progress, however, it was unclear whether, even with more time, Anthony could earn the requisite credits in math.

Rather than endure further harassment and try to graduate with a Regents diploma, Anthony could also accept an IEP diploma.  Students with IEP diplomas can attend certain community colleges, but employers, the military, four-year colleges, apprenticeship programs, and business or trade schools generally do not accept them.

Mrs. Zeno expressed concern about the IEP diploma, but she felt she had no choice:  "I couldn't allow Anthony to do another two years in that school and be subjected to that abuse. . . . [H]e was being torn apart by these tormentors in attacking his color . . . the way he looked." While Anthony was enrolled at SMHS, Mrs. Zeno met with Howe between thirty and fifty times.  The school never offered

proactive solutions; on the contrary, Howe told Mrs. Zeno that he was unsure of how to keep Anthony safe on a daily basis. He claimed that "he could only think of the short term, and that he would try to take every incident as [it] came and deal with it as [it] came."

Anthony finished his senior year as part of the BOCES program and graduated with an IEP diploma. His education at the District was complete.

## C.  *Proceedings Below*

On July 18, 2007, Anthony commenced this action against the District alleging discrimination in violation of Title VI. After discovery, the District moved for summary judgment. The district court denied the motion on May 20, 2009.

Trial commenced on March 8, 2010. After Anthony rested, the District orally moved for judgment as a matter of law. The court denied the motion, ruling from the bench. On March 12, 2010, the jury returned its verdict, finding that the District had violated Anthony's civil rights under Title VI, and awarding him $1.25 million in damages.

On April 13, 2010, the District renewed its earlier motion for judgment as a matter of law, and also moved for a new trial, a new trial limited to damages, or a remittitur of the jury award. By an August 5, 2010 memorandum and order, the district court granted the District's motion for a new trial, subject to Anthony's accepting a reduced award of $1 million. Anthony agreed to accept the reduced award on August 9, 2010, and the district court directed the Clerk of the Court to enter judgment in the sum of $1 million, as well as costs and fees, in favor of Anthony. The District filed its notice of appeal on September 3, 2010.[6] The district court entered an amended final judgment on September 9, 2010.[7]

---

[6] Although the District filed a premature notice of appeal, because the district court entered an amended final judgment before the appeal was heard and Anthony suffered no prejudice, the jurisdictional defect has been cured. *See, e.g.*, *Sahu v. Union Carbide Corp.*, 475 F.3d 465, 468 (2d Cir. 2007) (per curiam); *see also* Fed. R. App. P. 4(a)(2) ("A notice of appeal filed after the court announces a decision or order -- but before entry of the judgment or order -- is treated as filed on the date of and after the entry.").

[7] We reserved decision on this appeal pending the outcome in *DiStiso v. Cook*, 691 F.3d 226 (2d Cir. 2012), an appeal from a denial of summary judgment on the ground of qualified immunity with respect to claims alleging that

-18-

## *DISCUSSION*

The District advances two principal arguments on appeal. First, it contends that the district court erred by denying its motion for judgment as a matter of law. Second, and in the alternative, it argues that the damages award, as reduced, was still excessive. We address both of these arguments in turn.

**A.** ***The District's Liability for Student-on-Student Harassment Under Title VI***

The District contends that, as a matter of law, it was not deliberately indifferent to student harassment of Anthony. Specifically, it argues that (1) it reasonably responded to each reported incident, (2) it was under no obligation to implement the reforms requested by Anthony's lawyer, and (3) it never knew that its responses were inadequate or ineffective. Hence, it asserts that, on the

---

faculty and administration had been deliberately indifferent to peer harassment in violation of 42 U.S.C. § 1983. This Court affirmed in part and reversed in part, remanding the case for further proceedings.

record presented, no reasonable jury could have returned a finding of liability.  We disagree.

1.  *Applicable Law*

We review *de novo* a district court's denial of a judgment as a matter of law.  *See, e.g., Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *Townsend*, 679 F.3d at 51.  A court may grant judgment as a matter of law only if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis" for its decision.  Fed. R. Civ. P. 50(a)(1).  Therefore, we will only reverse a district court's denial of a motion for judgment as a matter of law if, drawing all inferences in favor of, and reviewing all evidence in the light most favorable to, the plaintiff, no reasonable juror could have returned a verdict for the plaintiff.  *See, e.g., Townsend*, 679 F.3d at 51; *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010).

Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or

national origin.[8]  *See* 42 U.S.C. § 2000d.  Public educational institutions that receive federal funds are subject to this mandate.  34 C.F.R. § 100.13(i) (2000) (defining "recipient" to include any public "agency, institution, or organization, or other entity . . . in any State, to whom Federal financial assistance is extended"); *see also id.* § 100.13(g)(2)(ii).

Title VI prohibits intentional violations of the statute.  *See Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001) (citing *Alexander v. Choate*, 469 U.S. 287, 293 (1985)).  In certain circumstances, courts view actions of a third party as intentional violations by the funding recipient itself.  *See, e.g., Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (board of education can be liable for student-on-student harassment under Title IX); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-91 (1998) (school district

---

[8]     The statute provides:  "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d; *see also* 34 C.F.R. § 100.3(a) (2000).

can be liable for teacher-on-student harassment under Title

IX).[9]  For example, in the educational setting, a school

district is liable for intentional discrimination when it

has been "deliberately indifferent" to teacher or peer

harassment of a student.  *See, e.g.*, *Davis*, 526 U.S. at

643; *Gebser*, 524 U.S. at 290-91; *Papelino v. Albany Coll.

of Pharmacy of Union Univ.*, 633 F.3d 81, 88-89 (2d Cir.

2011) (teacher-on-student sexual harassment claim under

Title IX could survive summary judgment).

The deliberate indifference standard outlined by

the Supreme Court in *Davis v. Monroe County Board of

Education* is a narrow one.  *See* 526 U.S. at 644-45 (Title

IX "cabins the range of misconduct" prohibited, and a

school district's liability is limited).  Liability only

arises if a plaintiff establishes:  (1) substantial

control, (2) severe and discriminatory harassment, (3)

---

[9]  Historically, the Supreme Court has applied parallel analyses to claims brought under Title IX and Title VI.  *See, e.g.*, *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) ("[T]he Court has interpreted Title IX consistently with Title VI . . . ." (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 694-98 (1979))).

actual knowledge, and (4) deliberate indifference.[10]  *See*
*id.*, 526 U.S. at 643-50; *DiStiso v. Cook*, 691 F.3d 226,
240-41 (2d Cir. 2012) (listing three factors, but assuming
control, in Title IX case).

A school district will be subject to liability for
third-party conduct only if it "exercises substantial
control over both the harasser and the context in which the
known harassment occurs."  *Davis*, 526 U.S. at 644-45
(reasoning that the school must have "control over the
alleged harassment" and "authority to take remedial

---

[10]    Although the harassment in *Davis*, and the
"deliberate indifference" standard outlined by the Supreme
Court, arose under Title IX, we have endorsed the *Davis*
framework in cases of third-party harassment outside the
scope of Title IX.  *See, e.g.*, *DiStiso*, 691 F.3d at 226
(violation of section 1983); *Hayut v. State Univ. of N.Y.*,
352 F.3d 733 (2d Cir. 2003) (violation of 14th Amendment
Equal Protection Clause); *Gant ex rel. Gant v. Wallingford
Bd. of Educ.*, 195 F.3d 134 (2d Cir. 1999) (violation of
section 1981).  We now apply *Davis*'s deliberate
indifference standard to Anthony's Title VI claim.  *See
also Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty.*,
334 F.3d 928, 934 (10th Cir. 2003) (applying *Davis* to a
Title VI student-on-student harassment claim); *Saxe v.
State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 n.5 (3d Cir.
2001) (acknowledging that *Davis* "applies equally" to
harassment under Title VI or other federal anti-
discrimination statutes).

action").  A school district, the Supreme Court noted, exercises substantial control over the circumstances of the harassment when it occurs "during school hours and on school grounds."  *Id.* at 646.  Similarly, a school district's authority to take remedial action lies in its longstanding disciplinary oversight over its students.  *See, e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 342 n.9 (1985); *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 507 (1969).

Even assuming the requisite level of control, not all harassment is actionable.  The harassment must be "severe, pervasive, and objectively offensive" and discriminatory in effect.  *Davis*, 526 U.S. at 650-51; *see also DiStiso*, 691 F.3d at 242 (acknowledging "severity requirement").  Discrimination under Title VI is not limited to being excluded from, or denied the benefits of, a particular school program.  *See* 42 U.S.C. § 2000d; 34 C.F.R. § 100.3(a).  Discriminatory actions "[r]estrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit" under the school system.

34 C.F.R. § 100.3(b)(1)(iv); *see also id.* § 100.13(g)(2)(ii). Educational benefits include an academic environment free from racial hostility. *See Hayut*, 352 F.3d at 750 ("We also find that . . . [misconduct that] simply created a disparately hostile educational environment relative to her peers . . . could be construed as depriving [the victim] of the benefits and educational opportunities available at [the school].").

In addition, a school district must know of the harassment. Constructive knowledge is not enough; only actual knowledge is a predicate to liability. *See Davis*, 526 U.S. at 641-43; *Gebser*, 524 U.S. at 288.

Finally, "only deliberate indifference to [student-on-student] harassment can be viewed as discrimination by school officials themselves." *Gant*, 195 F.3d at 140 (citing *Davis*, 526 U.S. at 643-44). The school's action -- or inaction -- must, "at a minimum, cause students to undergo harassment or make them liable to or vulnerable to it." *Davis*, 526 U.S. at 645 (internal quotation and alteration omitted).

-25-

A finding of deliberate indifference depends on the adequacy of a school district's response to the harassment. *See Hayut*, 352 F.3d at 750. A failure to respond, *see id.* at 751, a response that "only follows after a lengthy and unjustified delay," *id.* (internal quotation omitted), and a response that "amount[s] to deliberate indifference to discrimination," *Gebser*, 524 U.S. at 290, have all been found inadequate.

Nevertheless, a school district's actions are only deliberately indifferent if they were "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648; *Gant*, 195 F.3d at 141. Thus, when weighing the adequacy of a response, a court must accord sufficient deference to the decisions of school disciplinarians. *See Davis*, 526 U.S. at 648 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators." (citation omitted)); *cf. Tinker*, 393 U.S. at 507. To that end, victims do not have a right to specific remedial measures. *See Davis*, 526 U.S. at 648.

## 2. *Application*

To successfully challenge the district court's denial of its motion for judgment as a matter of law, the District must demonstrate that no reasonable jury could have found that:  (1) it had the requisite control, (2) the harassment was severe and discriminatory, (3) it had actual knowledge, and (4) it responded inadequately to the harassment.  The District argues that:  (1) it responded swiftly and unequivocally to each reported incident of harassment; (2) its response was not deliberately indifferent merely because it did not implement shadowing or expel the harassers; and (3) it never knew that its responses were ineffective or inadequate.  We consider these arguments by addressing:  first, whether Anthony was subjected to actionable harassment, and, second, whether -- if so -- the District was deliberately indifferent.

### a. *Actionable Harassment*

On the record below, reasonable jurors could have found the harassment Anthony suffered to be "severe, pervasive, and objectively offensive."  *Davis*, 526 U.S. at 650-51.  The evidence presented at trial demonstrated that,

-27-

from 2005 through 2008, many students in the District taunted, harassed, menaced, and physically assaulted Anthony. His peers made frequent pejorative references to his skin tone, calling him a "nigger" nearly every day. They also referred to him as "homey" and "gangster," while making references to his "hood" and "fake rapper bling bling." He received explicit threats as well as implied threats, such as references to lynching.

Hence, the jury reasonably could have found that the harassment Anthony endured went beyond the non-actionable "simple acts of teasing and name-calling among school children." *Davis*, 526 U.S. at 652 (noting such harassment is insufficient to support a private right of action); *DiStiso*, 691 F.3d at 242-43 ("Defendants do not -- and cannot -- dispute that such conduct, particularly use of the reviled epithet 'nigger,' raises a question of severe harassment going beyond simple teasing and name-calling."). Furthermore, the evidence showed more than mere verbal harassment; Anthony also endured threats and physical attacks. Finally, the harassment continued for over three-and-a-half years. Accordingly, the jury surely

could have concluded that the harassment was severe, pervasive, and objectively offensive. *See C.S. v. Couch*, 843 F. Supp. 2d 894, 908 (N.D. Ind. 2011) (ten instances of racial slurs and violence over four-and-a-half years could be perceived as sufficiently severe); *see also Davis*, 526 U.S. at 653-54 (vulgar comments and sexually harassing conduct over five months was sufficiently severe to state a claim); *Doe ex rel. A.N. v. E. Haven Bd. of Educ.*, 430 F. Supp. 2d 54, 59-61 (D. Conn. 2006) (affirming jury verdict against school district where victim was sexually harassed by peers for three months after a sexual assault).

In addition, the jury reasonably could have concluded that as a result of the harassment, Anthony was discriminatorily deprived of three educational benefits. First, Anthony was deprived of a supportive, scholastic environment free of racism and harassment. *See Hayut*, 352 F.3d at 750 (creating a "disparately hostile educational environment relative to [a student's] peers" may be construed as a deprivation of educational benefits or opportunities).

Second, Anthony accepted an IEP diploma rather than pursue further studies at SMHS. *See* Trial Tr. 88:10-12 (Mar. 8, 2010) ("I couldn't allow Anthony to do another two years in that school and be subjected to that abuse."); 2006-2007 Anthony Zeno IEP, Pl.'s Trial Ex. 51, at 9. The IEP diploma was less likely to be accepted by employers or four-year colleges. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 100.5(b)(7)(iii) (2012) ("Earning . . . an [IEP] diploma . . . shall not be deemed to be equivalent to receipt of a high school diploma . . . ."). Thus, the harassment effectively deprived Anthony of a Regents diploma, a "benefit" provided by the District.

Finally, Anthony was driven to leave SMHS, the high school he had attended for three-and-a-half years, without completing his education. Where, as here, the decision to withdraw was motivated by a racially hostile educational environment, a strong nexus between the harassment and the deprivation of educational benefits is evident. *See Hayut*, 352 F.3d at 750 (conduct causing student to withdraw from university could be interpreted as deprivation of educational benefits or opportunities).

Thus, the evidence presented at trial was sufficient to support the jury's conclusion that Anthony was subjected to actionable harassment.

### b. *Knowledge, Control, and Adequacy of Response*

We turn now to the District's knowledge of, control of, and response to the harassment.

With respect to the District's actual knowledge of the ongoing harassment, the record reflects that it received reports of harassment affecting Anthony from many quarters. First, faculty and staff members at the District reported numerous incidents to Howe during Anthony's first two years at SMHS. Second, Anthony also reported racial harassment in the hallways throughout his three-and-a-half years at SMHS. Third, during that same time period, Mrs. Zeno contacted school administrators between thirty and fifty times. Fourth, various third parties -- the Dutchess County HRC, the Dutchess County N.A.A.C.P., the Zenos' attorney, and the police -- raised the issue of students harassing Anthony with the District. Hence, on this record, the jury easily could have found that the District actually knew of the continuing harassment of Anthony.

In addition, the record supports the jury's finding that the District had "substantial control" over the circumstances of the harassment Anthony endured. The incidents described above occurred on SMHS grounds or its property (such as the buses to BOCES) -- including, for example, shouts of "nigger" in the hallways, death threats in the classroom or bathroom, and an attempted assault with a chair in the cafeteria. *See Davis*, 526 U.S. at 646 (school has control over harassment that occurs "during school hours and on school grounds").

A reasonable jury could have also concluded that the District exercised the requisite control because Anthony's harassers were students. Because school officials are charged with "prescrib[ing] and control[ling] conduct in the schools," *cf. Tinker*, 393 U.S. at 507, the District had disciplinary oversight over the harassers. Hence, the District had "substantial control" over the harassment.

The third and principal issue facing the jury was whether the District was deliberately indifferent to the student-on-student harassment. The District's responses to

the harassment of Anthony took two forms: immediate

discipline of Anthony's identified harassers and, later,

various non-disciplinary responses.

The District argues that its disciplinary response

could not constitute deliberate indifference because it

immediately suspended nearly every student who was

identified as harassing Anthony. In addition, it contacted

students' parents or withdrew privileges (such as the right

to participate in extracurricular activities). The

District notes that only two students were identified as

repeat offenders, and reported incidents declined after

March 2006.

In some circumstances, prompt disciplinary action

against a student's identifiable harassers may show that a

school district was not deliberately indifferent.[11] The

_____

[11]    *See, e.g.*, *Fitzgerald v. Barnstable Sch. Comm.*,
504 F.3d 165, 173-74 (1st Cir. 2007) (prompt response to
harassment, immediate investigation, proposed remedial
measures, and cooperation with police -- who recommended no
further action -- were not deliberately indifferent
responses), *rev'd on other grounds by*, 555 U.S. 246 (2009);
*Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007)
(separating harasser and victim, and involving the guidance
counselor, were not deliberately indifferent responses to
peer sexual harassment, even if ineffective); *Doe ex rel.
Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 388-89 (5th

sufficiency of a response, however, must be considered "in light of the known circumstances," *DiStiso*, 691 F.3d at 241 (internal quotation omitted); *accord Hayut*, 352 F.3d at 751; *Gant*, 195 F.3d at 141, and as the "known circumstances" change, the sufficiency of a response may also have to evolve.

Here, five circumstances should have informed the District's continued response to student harassment of Anthony. First, it knew that disciplining Anthony's harassers -- through suspensions or otherwise -- did not deter others from engaging Anthony in serious and offensive racial conduct. (During his sophomore year alone, Anthony was subject to eight separate incidents of harassment.) Second, the harassment directed at Anthony grew increasingly severe. Of the eight incidents that occurred during his sophomore year, two were violent, three were threats on his life, and two resulted in Orders of Protection against the students involved. Third, the disciplinary action had little effect, if any, on the

---

Cir. 2000) (ineffective or negligent response was not deliberate indifference).

taunting and other hallway harassment, which persisted until Anthony left SMHS, three-and-a-half years after he arrived. Fourth, the District knew that the harassment predominantly targeted Anthony's race and color. And fifth, as early as November 2005, the Dutchess County HRC and N.A.A.C.P. offered the District both a free shadow, to accompany Anthony during the school day, and a free racial sensitivity training series.

At the conclusion of the trial, the district court instructed the jury regarding deliberate indifference as follows:

> Deliberate indifference means that the defendant's response or lack of response to the alleged harassment was clearly unreasonable in light of the known circumstances. Deliberate indifference may be found where a defendant takes remedial action only after a lengthy and unjustifiable delay or where defendant's response was so inadequate or ineffective that discriminatory intent may be inferred. In other words, deliberate indifference requires a finding that the District's actions or inactions in response to known harassment effectively caused further harassment to occur.

Trial Tr. 730:6-15 (Mar. 11, 2010).[12] The jury was entitled to evaluate the District's response in light of this instruction and all the evidence presented.

Responses that are not reasonably calculated to end harassment are inadequate. *See, e.g., Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000) ("Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances."); *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1261 (11th Cir. 2010) (endorsing Sixth Circuit's approach). The jury could have found and apparently did find that the District's remedial response was inadequate -- and deliberately indifferent -- in at least three respects.

First, although the District disciplined many of the students who harassed Anthony, it dragged its feet

---

[12] Neither party objected to the substance or form of this instruction, Trial Tr. 735:13 to 736:3 (Mar. 11, 2010), which accurately summarized the state of the law, *see generally Davis*, 526 U.S. 629; *Gebser*, 524 U.S. 274; *Hayut*, 352 F.3d 733.

before implementing any non-disciplinary remedial action --

a delay of a year or more.[13]  While many cases address

delays preceding a school's initial response, once a school

is aware of its ineffective response, a delay before

implementing further remedial action is no less

problematic.  *See Wills v. Brown Univ.*, 184 F.3d 20, 26

(1st Cir. 1999) ("[E]vidence of an inadequate response is

pertinent to show fault and causation where the plaintiff

is claiming that she was harassed or continued to be

harassed *after* the inadequate response.").  At some point

after Anthony's first semester, the District should have

done more, and its failure to do more "effectively caused"

---

[13]    *See, e.g.*, *Davis*, 526 U.S. at 644-45; *Kracunas v. Iona Coll.*, 119 F.3d 80, 90 (2d Cir. 1997) (in Title IX case, four-to-six month delay could be viewed as deliberately indifferent), *abrogated in part on other grounds by Gebser*, 524 U.S. at 290-91 (1998); *Doe ex rel. Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 235 (D. Conn. 2009) (denying motion for summary judgment because a jury could reasonably conclude deliberate indifference from six-month delay before school removed sexual assaulter and harasser from victim's class); *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 447 (D. Conn. 2006) (denying motion for summary judgment because, in part, a failure to respond to a student's sexual assault, despite receiving notice several weeks earlier, could be viewed as deliberate indifference).

further harassment.[14]  *See Davis*, 526 U.S. at 642-43 (internal quotation marks omitted).  The jury was entitled to find, and the record shows, that the District's delay in taking additional action here was unreasonable.

Second, the jury could have reasonably found that the District's additional remedial actions were little more than half-hearted measures.  For example, it coordinated mediation, but did not inform Mrs. Zeno when or where it would be held.  Its additional programs either (1) did not focus on racial bias or prejudice, or (2) made attendance optional.  This was evident in the District's training for students, parents, and teachers; it was for one day only and focused on bullying and sexual harassment, rather than

---

[14]  The District, in fact, was well aware of its longstanding legal duty to "take reasonable steps to eliminate" racial harassment in its schools.  Office for Civil Rights, "Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance," 59 Fed. Reg. 11448, 11450 (Mar. 10, 1994); *cf.* Office for Civil Rights, "Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties," 62 Fed. Reg. 12034, 12042 (Mar. 13, 1997) ("[A school district] should take immediate and appropriate steps to investigate or otherwise determine what occurred and take steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again.")*, cited in*, *Davis*, 526 U.S. at 647-48.

racial discrimination. Likewise, Project Wisdom's morning announcements were messages meant to inculcate civic and personal values, rather than address racism and discrimination. The District's first bias-specific training (the James Childs program) did not occur until November 2006, nearly twenty-one months after peer harassment of Anthony began. Attendance was optional. Anthony saw none of his harassers at the event. Similarly, although the District reorganized an extracurricular student group (STOP) aimed at addressing prejudice, STOP members were a self-selecting group.

The record indicates that these programs were selected in lieu of the free shadow or racial sensitivity training offered by the Dutchess County HRC and N.A.A.C.P. in November 2005, almost a year earlier and only nine months after Anthony was first harassed. Although *actually* eliminating harassment is not a prerequisite to an adequate response, *Davis*, 526 U.S. at 648 ("purging their schools of actionable peer harassment" is not required); *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009) (same), the District's actions could not have plausibly

changed the culture of bias at SMHS or stopped the harassment directed at Anthony. A jury was entitled to compare the alternatives offered by the Dutchess County HRC and N.A.A.C.P. with the District's programs when it evaluated the adequacy of the District's ultimate response. Thus, we conclude that the record supports the jury's finding that the District's deliberately indifferent responses effectively caused Anthony's continued harassment.[15]

Finally, despite the District's present argument that it did not know its responses were inadequate or ineffective, a jury reasonably could have found that the District ignored the many signals that greater, more directed action was needed. For example, although Stoorvogel, the school officer charged with investigating

_____

[15] Because the shadow and racial sensitivity trainings were remedies requested by the Zenos, the District contends that it cannot be found deliberately indifferent merely because it did not implement these specific responses. We agree. *See, e.g.*, *Davis*, 526 U.S. at 648 (no requirement that "administrators . . . engage in particular disciplinary action"); *Gant*, 195 F.3d at 141 (review of school disciplinary action should not be transformed into a question of fact). Nonetheless, the right to select among various appropriate remedies is not -- by itself -- a shield against liability.

Title VI complaints, knew that Anthony was being harassed, she elected not to investigate, which might have prompted an earlier and adjusted administrative response. Further, although reported incidents "decreased significantly" after March 2006, during the thirteen months prior, Anthony had been menaced, threatened, and taunted. He endured numerous serious -- and sometimes life-threatening -- incidents of harassment. Moreover, the District knew that Anthony was called "nigger" and other racial slurs during his entire three-and-a-half years at SMHS. The jury was entitled to conclude that the District knew that greater action was required.

Reviewing the facts in the light most favorable to Anthony, we conclude that there was sufficient evidence in the record to support the jury's finding that the District's responses to student harassment of Anthony "amount[ed] to deliberate indifference to discrimination." *Gebser*, 524 U.S. at 290. Accordingly, we affirm the district court's denial of the District's motion for judgment as a matter of law.

**B. *Damages***

The District contends that the $1 million award, as reduced, is excessive. We disagree.

**1. *Applicable Law***

Title VI provides a private right of damages against a school district for student-to-student harassment if the school district was deliberately indifferent to the known harassment. *Davis*, 526 U.S. at 643-44. This right, however, is only available for compensatory damages; there is no remedy for punitive damages. *See Barnes v. Gorman*, 536 U.S. 181, 187-88 (2002) (finding that neither explicit nor implied punitive damages provisions can be read into Title VI).

We have long held that, when damages are awarded, "calculation of damages is the province of the jury." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990); *see also Walz v. Town of Smithtown*, 46 F.3d 162, 170 (2d Cir. 1995). As a result, we may set aside a jury's award only if it is "so high as to shock the judicial conscience and constitute a denial of justice." *Manganiello*, 612 F.3d at 168 (internal quotation omitted). In addition, in reviewing

damages awards, "[w]e accord considerable deference to the factual findings of both judge and jury." *Blissett v. Coughlin*, 66 F.3d 531, 536 (2d Cir. 1995). Although a review of comparable cases is appropriate, we need not average the high and low awards; we focus instead on whether the verdict lies "within [the] reasonable range." *Ismail*, 899 F.2d at 187.

We review a district court's ruling on remittitur for abuse of discretion. *See*, *e.g.*, *Martinez v. Port Auth. of N.Y. & N.J.*, 445 F.3d 158, 160 (2d Cir. 2006) (per curiam) (applying a "deferential standard of review" to a lower court's remittitur calculation); *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 258 (2d Cir. 2005). Our review is particularly deferential when the district court applies the least intrusive standard to calculate remittitur -- granting remittitur "only to the maximum amount that would be upheld by the district court as not excessive." *Earl v. Bouchard Transp. Co., Inc.*, 917 F.2d 1320, 1330 & n.8 (2d Cir. 1990); *see also Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 244-45 (2d Cir. 2004); *DiSorbo v.*

*Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) (appellate review of compensatory damages award is "narrow").

### 2. *Application*

The District objects to the reduced $1 million award on three grounds. First, it argues that Anthony failed to present sufficient evidence to sustain the $1 million award. Second, it asserts that this Court should look to employment discrimination cases for guidance because Anthony has established only "garden variety" damages. Third, the District contends that the compensatory damages awarded to Anthony far exceed those in other cases of student-on-student harassment.

First, we conclude that the record contained sufficient evidence to uphold the jury's award. Evidence presented at trial, including the testimony of Anthony, his mother, and Maxey (of the N.A.A.C.P.), revealed Anthony's increasing frustration, loneliness, and other emotional anguish. While Anthony's testimony alone arguably might not support his claim of emotional distress, *see, e.g.,* *Annis v. Cnty. of Westchester*, 136 F.3d 239, 249 (2d Cir. 1998) ("[T]he only evidence of [the victim's] emotional

distress -- her own testimony -- is insufficient to warrant an award of compensatory damages for that injury."), others who testified corroborated Anthony's suffering and distress, *see, e.g., Patrolmen's Benevolent Ass'n of the City of N.Y. v. City of N.Y.*, 310 F.3d 43, 56 (2d Cir. 2002) (damages for emotional distress warranted if plaintiff's testimony is corroborated by other evidence). In addition, evidence of medical attention is not required to establish damages for emotional distress. *See Miner v. City of Glens Falls*, 999 F.2d 655, 663 (2d Cir. 1993).

Moreover, Anthony demonstrated that he suffered "substantially adverse educational consequences" as a result of the District's deliberate indifference. Appellee Br. at 69. Anthony's prolonged harassment resulted in an educational environment that was disparately hostile, depriving him of a scholastic benefit. *Hayut*, 352 F.3d at 750. Anthony also accepted the IEP diploma rather than attempt to satisfy the Regents requirements. As a consequence, the jury reasonably could have found that his ability to attend college or enter the workforce was significantly and adversely impaired.

Second, as to the District's argument that Anthony has proved no more than the "garden variety" damages of the type found in employment discrimination cases, the fact is that this is not an employment discrimination case, nor are the damages of the "garden variety" type. Anthony was not an adult losing sleep due to workplace stress. Rather, he was a teenager being subjected -- at a vulnerable point in his life -- to three-and-a-half years of racist, demeaning, threatening, and violent conduct. Furthermore, the conduct occurred at his school, in the presence of friends, classmates, other students, and teachers. The jury reasonably could have found that the harassment would have a profound and long-term impact on Anthony's life and his ability to earn a living.[16]

---

[16] The district court relied on guidance from the Department of Education when it determined that workplace discrimination claims were not analogous to the corrosive effect of condoned discrimination in the schools. Mem. & Order, at 5 (Aug. 5, 2010), ECF No. 83 ("'[V]erbal harassment of a . . . child by fellow students that is tolerated or condoned in any way by adult authority figures is likely to have a far greater impact than similar behavior would on an adult.'" (quoting Dep't of Educ., 59 Fed. Reg. 11448, 11449 (Mar. 10, 1994))).

Third, as to the District's contention that the $1 million award far exceeds other awards and "shock[s] the judicial conscience," *Manganiello*, 612 F.3d at 168, we are not persuaded.  Indeed, the district court's award as reduced was "located within the range of permissible decisions."  *Id.* at 165 (internal quotation omitted).  A review of cases in the educational context indicate that verdicts range from the low six figures, to the mid-six figures, to as much as $1 million.[17]  Given the severity,

---

[17]    *See, e.g.*, *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 256-58 (6th Cir. 2000) ($220,000 jury verdict for student who was sexually harassed by peers who made comments, tried to rip her clothes off, and stabbed her in the hand); *Howard v. Feliciano*, 583 F. Supp. 2d 252, 256-59 (D. P.R. 2008) (upholding $1 million jury award in a Title VI teacher-on-student harassment case); *Doe ex rel. A.N. v. E. Haven Bd. of Educ.*, 430 F. Supp. 2d 54, 55-56 (D. Conn. 2006) ($100,000 jury verdict under Title IX, where student, after being raped by two students, was harassed by her peers); *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 394 F. Supp. 2d 1299, 1301 (D. Kan. 2005) ($250,000 jury verdict under Title IX for peer harassment of student on the basis of sexual orientation); Judgment in Favor of Plaintiff Against Defendant, *Patterson v. Hudson Area Schs.*, No. 05-74439 (E.D. Mich. Mar. 30, 2010), ECF No. 182 (jury awards $800,000 in a student-on-student Title IX case), *rev'd by* 724 F. Supp. 2d 682 (E.D. Mich. 2010) (judgment vacated on the basis of liability); Civil Judgment, *Enright v. Springfield Sch. Dist. No. 464*, No. 04-cv-1653, (E.D. Pa. Dec. 8, 2006), ECF No. 87 ($400,000 award for 7-year-old who was sexually assaulted by two high school students on the bus).

duration, and egregiousness of Anthony's unchecked harassment, his reduced compensatory damages award was not outside the "range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation omitted); *Ismail*, 899 F.2d at 187 (appellate review focuses on whether the verdict lies "within [the] reasonable range"). Because of the limited nature of our review and the fact-intensive nature of this case, *see Gasperini v. Ctr. for Humanities, Inc.*, 149 F.3d 137, 141 (2d Cir. 1998) ("Deference is justified because the district judge is closer to the evidence, and is therefore in a better position to determine whether a particular award is excessive given the facts of the case."), we decline to upset the district court's decision.

Given the ongoing and objective offensiveness of the student-on-student harassment here, we hold that the district court did not abuse its discretion in determining that the record could support an award to Anthony of $1 million. *See In re Sims*, 534 F.3d at 132.

### *CONCLUSION*

For the reasons set forth above, the orders and amended final judgment of the district court are **AFFIRMED.**