In the

# United States Court of Appeals

### For the Seventh Circuit

No. 13-2551

JANE DOE, a minor,

*Plaintiff-Appellant*,

*v.*

DON GALSTER, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 09-CV-1089—**Patricia J. Gorence**, *Magistrate Judge*.

ARGUED FEBRUARY 10, 2014 — DECIDED SEPTEMBER 19, 2014

Before WOOD, *Chief Judge*, HAMILTON, *Circuit Judge*, and
KENDALL, *District Judge*.*

HAMILTON, *Circuit Judge*. Plaintiff "Jane Doe" was born in
Russia and came to the United States at the age of two when

---

* The Honorable Virginia M. Kendall, United States District Judge
for the Northern District of Illinois, sitting by designation.

she was adopted by American parents. During her sixth and seventh grade years at Elmbrook School District's Pilgrim Park Middle School, several male classmates bullied her, sometimes hurling gendered or ethnic insults. The bullying turned violent near the end of seventh grade. Three boys were eventually charged with criminal battery and were expelled or withdrew from school.

Doe filed this suit against the Elmbrook School District and several school administrators under Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972. She alleges that the bullying was motivated by her sex and ethnicity and that the school was legally responsible for it. Based on the same allegations, Doe also asserts a claim under 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment. The district court granted summary judgment for the defendants, and Doe has appealed.

We affirm. Although Doe's classmates' actions were inexcusable, the undisputed evidence shows that the defendants are not legally responsible for those actions. Keeping in mind how thoughtless and even cruel children can be to one another, the Supreme Court has interpreted both Title VI and Title IX to impose a demanding standard for holding schools and school officials legally responsible for one student's mistreatment of another. School officials must have had "actual knowledge" of harassment "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe County Board of Education*, 526 U.S. 629, 650 (1999). To have actual knowledge of an incident, school officials must have witnessed it or re-

ceived a report of it. *Gabrielle M. v. Park Forest-Chicago Heights, Illinois School Dist. 163*, 315 F.3d 817, 823–24 (7th Cir. 2003). To impose liability, school officials' response to known harassment also must have been "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.

In this case—even assuming Doe's harassers were motivated by her sex or ethnicity—once the defendants gained actual notice of behavior that could qualify as severe and pervasive, they took action against the wrongdoers that fell well within their broad discretion. In other words, the defendants were not deliberately indifferent to the harassment of Doe. That conclusion also defeats Doe's equal protection claim.

I.  *Factual and Procedural Background*

Most of Doe's problems at school involved her classmate T.M. and two of his friends. Doe argues that school officials did not do enough to prevent the boys from harming her. Because we are reviewing a grant of summary judgment, we present the evidence in the light most favorable to Doe, the non-moving party, giving her the benefit of conflicts in the evidence and reasonable inferences that might be drawn from it. See *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

T.M. and his friends began harassing Doe in sixth grade, though none of the harassment during that year was so severe or pervasive as to implicate Title VI or Title IX. Some of the incidents were witnessed by school officials or reported to an official by Doe. For example, T.M. erased some of Doe's schoolwork from a computer (she responded in kind), and he threw a ball at her in gym class. Teachers admonished

T.M. not to do those things again. T.M. and a friend, J.Q., also called Doe "bitch" and "whore" on more than one occasion. Doe discussed this name-calling with Ms. Lakatos, a guidance counselor.

The harassment continued in the second semester of seventh grade. Initially, the incidents were similar to those from the previous year. One day T.M. opened Doe's binder and let the papers fall to the floor. A teacher saw this and told T.M. to help Doe pick the papers up. Another teacher intervened when M.C., one of T.M.'s friends, came into Doe's classroom and knocked papers off her desk. Also, the band director noticed Doe and T.M. pushing each other in band class one day and ordered both to serve a period of detention.

During that same semester, Doe and T.M. engaged in insults and name-calling. According to Doe, she once said something to upset T.M., and he replied by saying, "you're a stupid Russian." Doe and T.M. would also call each other "bitch" from time to time. Doe does not recall reporting these incidents to anyone and does not know whether any school official knew about them. She did report to Lakatos, whom she had continued to see regularly, that she was having trouble generally with T.M.

School administrators, knowing that Doe and T.M. did not get along, took steps to keep them apart. Sometime in March of their seventh grade year, Associate Principal Hinz had Doe and T.M. sign an agreement that they would stay away from each other. She also assigned them to different "Homework Club Rooms" and separated their lockers, which had been only two or three lockers apart.

Doe reported other specific incidents of harassment that did not involve T.M. or his friends to her mother and Lakatos, but she gave them conflicting accounts. In an email to Lakatos, Doe's mother explained that Doe told her that a boy had punched her in the stomach and had been suspended as a result, and that other children had harassed Doe on the bus for being Russian. Lakatos responded after speaking to Doe and school employees. Lakatos explained that no one had been suspended for punching Doe and that no school employee knew anything about a punch. Doe had told Lakatos that the punch was not hard and was meant for someone else. She had declined to tell Lakatos who harassed her on the bus, explaining that she wanted to put the issue behind her.

Lakatos encouraged Doe to report harassment and told her that any student who retaliated against her for making a report would be punished. Following the email exchange between Doe's mother and Lakatos, Doe sent Lakatos a note to apologize for lying to her. She said that she had made up the punch entirely but that the story about the bus was true. In Doe's later deposition for this case, she said that a boy she did not know had in fact punched her but that she had not reported it because she had not wanted him to get in trouble.

As seventh grade drew to a close, T.M.'s and his friends' mistreatment of Doe escalated. One day late in the school year, Doe drew on T.M.'s shirt with a marker. In retaliation T.M. followed her to her locker and punched her in the face with a closed fist. One of Doe's friends saw part of the incident and alerted a teacher whose classroom was nearby. The teacher asked Doe what had happened. Doe told her that nothing had happened, assuring the teacher that she would

tell her if something had. Doe did not tell her parents or any school official about the punch.

Sometime in May, not long after T.M. had punched Doe, the two of them and other students, including T.M.'s friend M.C., were at a track meet. While T.M. and M.C. were running their event, one of Doe's friends dropped T.M.'s jacket over the back of the bleachers to the ground and then left. When T.M. returned, he found his jacket on the ground and blamed Doe for dropping it there. He hit Doe with his spiked track shoe on her arm and knee, breaking the skin, drawing blood, and leaving several puncture wounds. He told her that he would kill her if she told anyone. When Doe was heading for the bus after the meet, T.M. and M.C. approached her from behind. M.C. hit her with his spiked track shoe five or six times in the back of her thigh. No coaches saw this, and Doe did not tell anyone at the time.

The final and most violent incident was on the last day of school. Doe and other students were on the playground during recess. T.M., M.C., and J.Q. were there playing basketball. M.C. mistakenly thought that Doe and her friends were laughing at him. After M.C. threw a ball at her and she threw it back at him, the boys picked up sticks from the woods and began chasing her. The boys caught her and hit her with the sticks on her arm and back. They then stopped for a while but soon began chasing her again. Doe ran past a teacher who ordered the boys to put the sticks down, which they did. But after the teacher was out of sight, M.C. picked up a stick and hit Doe on her back again. No school official saw Doe being hit, and she did not report what had happened at that time.

While recess continued, another teacher brought ice cream to the students on the playground. Doe threw hers at T.M. In response, he pushed Doe into a mud puddle, rubbed dirt on her face, and kicked her in the back. At this point, a teacher saw what was happening and intervened, sending both of the students inside to see Associate Principal Hinz. Hinz had Doe and T.M. complete written statements about the incident. After telling them that she would be contacting their parents, she allowed them to catch their buses home. Hinz then called their parents.

When Doe got home, she told her parents what T.M. and his friends had done to her that day and on previous occasions. She and her father returned to the school to discuss these events with Hinz. While they were there, Doe's father called the local police department. An officer arrived and inspected Doe's wounds, noting multiple injuries: an "extremely red and puffy" welt twelve to sixteen inches long across the middle of Doe's back, as well as other welts several inches long on her arms and legs and puncture marks on both legs.

The school district opened an investigation into the full extent of what T.M. and his friends had been doing to Doe. Principal Don Galster interviewed witnesses. He focused on three incidents: the sticks incident, the track-meet incident, and the incident in which T.M. punched Doe in the face at her locker. Galster regarded these incidents as more serious than and different from incidents earlier in the semester. The school's investigation was completed within twelve days. The police also investigated. T.M. was charged with several counts of misdemeanor battery, and the two other boys were also charged with misdemeanor battery.

Principal Galster visited Doe and her parents in June or July to apologize to Doe for what had happened, to assure her that it was not her fault, and to let her know that there had been an investigation. He told Doe and her parents that he would be recommending that all three boys be expelled.

At some point that summer, Doe's parents asked that she be assigned to a different school in the district for the next school year. School officials denied the request. Near the end of the summer, Doe's parents requested a safety plan but were told that they "would have to trust" that Doe would be protected. Facing expulsion, T.M. and M.C. withdrew from the school district in July. In August, J.Q. was expelled.

The Does made a decision to move out of the Elmbrook School District just before Labor Day, 2008. At the time the Does decided to move, they knew that at least one of the three boys had withdrawn, but the school district had not told them that none of the boys would be returning to Pilgrim Park for eighth grade. According to Superintendent Matthew Gibson, there was a "tension between wanting to ensure [sic] a victimized student … that she's going to be safe in the future and respecting the confidentiality of the disciplined perpetrators."

When Jane Doe gave her deposition testimony in 2012, she was still in treatment for post-traumatic stress disorder, but she had given three public addresses on the subject of school bullying. She also pushed for the passage of Wisconsin's first anti-bullying law, and she has been recognized by the Wisconsin legislature for her leadership on the subject.

II.  *Analysis*

A.  *Doe's Claims under Title VI and Title IX*

Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title IX of the Education Amendments of 1972 makes the same guarantee but substitutes "on the basis of sex" for "on the ground of race, color, or national origin." 20 U.S.C. § 1681(a). Title VI and Title IX are so similar that a decision interpreting one generally applies to the other. *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 258–59 (2009); *Doe v. Smith*, 470 F.3d 331, 338 (7th Cir. 2006).

The Supreme Court has set a high bar for plaintiffs seeking to hold schools and school officials liable for student-on-student harassment. School officials are given broad latitude to resolve peer harassment and are liable only in "certain limited circumstances." *Davis*, 526 U.S. at 643 . A peer-harassment plaintiff must demonstrate that the harassment was discriminatory, the school officials had "actual knowledge" of the harassment, the harassment was "so severe, pervasive, and objectively offensive that it … deprive[s] the victims of access to educational opportunities," and officials were "deliberately indifferent" to the harassment. *Id.* at 650. The Court made clear that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id*. at 648.

1.  *Discriminatory Harassment*

Title VI protects students from discrimination only if it is based on race, color, or national origin, and Title IX only if based on sex. As noted above, there were some explicit references to Doe's Russian origin. Regarding sex, in the context of adult employment, we have held that gendered words like bitch and whore, even if used to describe both women and men, can be strong evidence that the harassment at issue is on the basis of sex. See *Passananti v. Cook County*, 689 F.3d 655, 665–67 (7th Cir. 2012) (reversing summary judgment for employer because supervisor's repeated use of "bitch" to refer to plaintiff could support finding of sexually hostile environment). The issue is more subtle in the school context because "at least early on, students are still learning how to interact appropriately with their peers." *Davis*, 526 U.S. at 651. Children are often less aware of the import of their words and actions. The district court concluded that no reasonable jury could find that any of the bullying Doe suffered was based on her national origin or gender. We are not as convinced, but we need not resolve the issue because, as explained below, Doe's claims fail for other reasons.

2.  *Actual Knowledge*

School administrators learned of some of the more minor incidents between Doe and other students contemporaneously, but it is undisputed that they did not witness and were not told about the violent incidents until the evening of the last day of her seventh grade year at the earliest. Doe argues, however, that counselor Lakatos and other school offi-

cials knew enough about the situation to trigger further investigation long before Doe's last day of seventh grade.

School administrators certainly cannot escape liability by putting their heads in the sand, but there is no evidence that any school official willfully avoided learning of serious threats to Doe's safety or ability to obtain an education. The standard set out in *Davis* is not satisfied by knowledge that something might be happening and could be uncovered by further investigation. The standard is "actual knowledge." School administrators have actual knowledge only of the incidents that they witness or that have been reported to them. *Gabrielle M.*, 315 F.3d at 823–24. In this case, administrators knew about the name-calling and a number of other disputes between Doe, T.M., and others. There is no evidence, however, that they knew before the last day of school about the much more severe events that they did not witness: T.M. punching Doe in the face, the attacks at the track meet, or that day's attacks with sticks.

### 3. *Harassment that Denies Equal Access*

Federal law does not protect students from commonplace schoolyard altercations, including name-calling, teasing, and minor physical scuffles. As the Supreme Court stressed in *Davis*, "children may regularly interact in a manner that would be unacceptable among adults." 526 U.S. at 651. At school they "often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it," but "[d]amages are not available for simple acts of teasing and name-calling among school children." *Id.* at 651-52. This is true "even where these comments target differences in gender." *Id.* at 652. Instead, to be actionable, the harassment must be serious enough to

"den[y] its victims the equal access to education that Title IX is designed to protect." *Id.*

The incidents that the school district actually knew about before the last day of school did not amount to severe harassment that denied Doe equal access to educational benefits or opportunities. The name-calling and the various scuffles, even when viewed in the light most favorable to Doe, would have appeared to school administrators as the "simple acts of teasing and name-calling among school children" contemplated by the Supreme Court in *Davis*. 526 U.S. at 652. We assume that relatively minor incidents could be so numerous or incessant as to qualify as severe harassment under Title VI or Title IX, but a reasonable jury could not find that the incidents school officials knew about before the last day of school rose to that level.

On the other hand, a reasonable jury could find that the violent physical attacks toward the end of seventh grade added up to severe or pervasive harassment that denied Doe equal access to educational benefits or opportunities. These attacks could qualify as "objectively offensive." *Davis*, 526 U.S. at 650. In one, T.M. pushed Doe and punched her in the face in the hallway after class. In another, T.M. and M.C. repeatedly hit Doe with metal track spikes at a track meet, making her limp and bleed. In yet another, all three of the boys hit Doe with sticks on the playground on the last day of school—leaving a foot-long welt on her back and other injuries. The attacks eventually drove Doe out of the school district.

A reasonable jury could find that the cumulative effects of this abuse were comparable to harassment found in rare cases to be sufficiently severe under Title VI and Title IX. In

*Zeno v. Pine Plains Central School District*, the Second Circuit affirmed a jury verdict for plaintiff, finding that the severity requirement was satisfied where the victim endured blatant racial slurs and physical attacks that warranted police attention, including instances in which the victim was punched and choked. 702 F.3d 655, 659–62, 667 (2d Cir. 2012). Because of this abuse, the victim opted to graduate early with a limited diploma rather than stay and complete the work needed for a full high school diploma. *Id.* at 663. Similarly, in *Vance v. Spencer County Public School District*, the Sixth Circuit affirmed a verdict for the plaintiff, finding sufficiently severe harassment where the victim's harassers sexually propositioned her, yanked off her shirt, and stabbed her in the hand. 231 F.3d 253, 259 (6th Cir. 2000). Because of this harassment, the victim began completing her studies at home. *Id.* And in *Murrell v. School District No. 1*, the Tenth Circuit found that a complaint sufficiently alleged severe harassment where the victim was sexually assaulted for a month and was eventually hospitalized and then rendered homebound by the abuse. 186 F.3d 1238, 1248 (10th Cir. 1999).

Doe, too, was subjected to multiple incidents of physical violence that merited police attention. Although Doe was not hospitalized like the victim in *Murrell* or forced to begin home-schooling like the victim in *Vance*, her family understandably decided to change school districts because of the prospect that one or two of the three boys might return to Pilgrim Park with Doe for eighth grade. The Does' reasonable decision to move to another school district is analogous to the victim's decision in *Zeno* to opt for an early graduation and a lesser diploma rather than face more harassment. In short, a reasonable jury could find that the violent attacks Doe suffered—which ultimately resulted in her leaving the

school district—constituted severe harassment that caused a negative and "systemic effect" on Doe's education. *Davis*, 526 U.S. at 653.

4.  *Reasonableness of the District's Response*

The standard of deliberate indifference sets a high bar for plaintiffs under Title VI and Title IX. See *Davis*, 526 U.S. at 643. School administrators must "continue to enjoy the flexibility they require" in disciplinary decisions unless their response to harassment is "clearly unreasonable." *Id.* at 648–49. The Court stressed in *Davis* that Title IX does not require administrators to "engage in particular disciplinary action." *Id.* at 648. We echoed this concern in *Gabrielle M.* We said that a "school may take into consideration administrative burdens or the disruption of other students' or their teachers' schedules in determining an appropriate response [to peer harassment]." 315 F.3d at 825. As the Fifth Circuit has observed, "Judges make poor vice principals … ." *Estate of Lance v. Lewisville Indep. School Dist.*, 743 F.3d 982, 996 (5th Cir. 2014).

Doe argues that the school officials knew about a pattern of non-severe harassment by T.M. and his friends during sixth grade and early in seventh grade, and that based on that pattern, the school should have done more to investigate and to prevent the violent acts that were committed against Doe at the end of the seventh grade. If we accepted that argument, however, we would be substituting a negligence standard for both the severity and deliberate indifference standards that control this case under *Davis*.

We agree instead with the district court that no reasonable jury could find that the defendants responded with de-

liberate indifference to any of the bullying or harassment that Doe suffered, including both the severe and non-severe incidents. In *Gabrielle M.*, we affirmed the grant of summary judgment in a Title IX case partly on the ground that the school district's response to the peer harassment at issue was not clearly unreasonable. 315 F.3d at 825. We emphasized: "After each reported or observed instance involving Jason [the harasser] and other students, Jason was disciplined and steps were taken to prevent future inappropriate conduct." *Id.* at 824. Similarly in this case, after every reported or observed incident of bullying involving Doe, school officials promptly intervened. As the incidents persisted and escalated, so did the school's responses.

The first incidents between Doe and T.M. occurred in the sixth grade. School officials responded adequately to each incident they knew about. When T.M. erased some of Doe's work in English class and Doe told the teacher, the teacher spoke with T.M. and explained that what he did was wrong. When the gym teacher saw T.M. throw a ball at Doe in gym class, the gym teacher involved counselor Lakatos, who also spoke with Doe about the name-calling between her and T.M. The involvement of guidance counselors and school psychologists is evidence that a school district was responding appropriately. *Porto v. Town of Tewksbury*, 488 F.3d 67, 76 (1st Cir. 2007); *Gabrielle M.*, 315 F.3d at 824.

When the problems between Doe and T.M. resurfaced in the second half of the seventh grade, the undisputed facts show that school officials again responded swiftly and reasonably to incidents they knew about. When a teacher saw T.M. dump Doe's papers on the floor, he ordered T.M. to help her pick them up. When M.C. knocked papers off her

desk, a teacher intervened. When the band director noticed Doe and T.M. pushing in band class, he gave both of them detention. In addition, counselor Lakatos continued to meet with Doe about once or twice a week.

School officials also took measures to reduce contact between Doe and T.M. by moving their lockers, assigning them to different study groups, and asking them to agree to stay away from each other. We found similar efforts showed that a school's response to harassment was not clearly unreasonable in *Gabrielle M.*, where school administrators assigned the victim and harasser to different lunch and recess periods. 315 F.3d at 824–25. Similarly, in *Porto v. Town of Tewksbury*, the First Circuit overturned a jury verdict and found that the school district was not deliberately indifferent because officials had taken measures to separate the victims from their harassers. 488 F.3d at 76.

The serious violence of the last day of school sparked a further escalation in the school's response to the bullying. On that day, school officials responded promptly to two observed incidents. When a teacher saw T.M. and his friends chasing Doe with sticks, the teacher had the boys put the sticks down. And later, when another teacher saw Doe throw ice cream at T.M. and T.M. push Doe down into a mud puddle, she sent them both to Hinz's office, and Hinz telephoned the students' parents. Courts applying the deliberate indifference standard from *Davis* have regarded the involvement of parents as evidence that a school district is responding to harassment in a reasonable manner. See, e.g., *Estate of Lance*, 743 F.3d at 1000–01 (applying *Davis* standard to affirm summary judgment for school district; finding no deliberate indifference where district engaged in a "pattern

of active responses" that included communicating with parents).

Doe's and her father's visit to Principal Galster later that day prompted his investigation into what exactly T.M. and his friends had been up to. In his investigation, Galster learned the full extent of what the boys had been doing to Doe on the last day of school—hitting her violently with sticks. He also learned about the track-meet incident and the incident in which T.M. punched Doe's face. Galster completed a thorough investigation, including interviewing witnesses, within twelve days of learning of the severe harassment. Cf. *Zeno*, 702 F.3d at 661, 671 (affirming a jury verdict for plaintiff for peer harassment where school district's Title VI and Title IX compliance officer knew of reports of racial harassment but "elected not to investigate"). Not long after the investigation, Galster met with the Does and informed them of his decision to recommend the three boys for expulsion.

Doe points out, however, that over the summer, the school district did not give her a formal safety plan even though her parents requested one. Nor did the school district grant her request to transfer to a different school. The school district also did not inform the Does that the three boys would not be returning to Pilgrim Park before the family decided to move to another school district at the end of August 2008. These facts still would not allow a reasonable jury to find that the defendants' actions were clearly unreasonable.

First, *Davis* does not entitle plaintiffs to any specific remedial measure. E.g., *Zeno*, 702 F.3d at 666 (disclaiming a victim's right to specific remedies and according deference to school officials). The school was not required by federal law

to give Doe a formal safety plan. We also do not see how failing to adopt a formal safety plan could be clearly unreasonable in light of the fact that the harassing students were in the process of being expelled, making a safety plan less necessary.

Second, it is true that in *Gabrielle M.*, we regarded the fact that a school district granted the student-victim's request to transfer to a different school as evidence that the school district's response to her harassment was not clearly unreasonable. 315 F.3d at 825. But that does not make the denial of Doe's request to transfer to a different school clearly unreasonable, at least when Doe's harassers were in the process of being expelled and likely would not return to her school for eighth grade and in fact did not return.

Finally, we do not think it clearly unreasonable that the school district failed to tell the Does by a specific date that summer that the boys would not be returning. As Superintendent Gibson correctly explained, although Doe's family understandably would have liked to know what was happening in the boys' expulsion hearings, school officials also had to respect the privacy rights of the disciplined students. See generally Wis. Stat. § 118.125 (confidentiality of pupil records). Given this tension between the legal rights of all the students involved, a reasonable jury could not find that it was clearly unreasonable for school officials not to inform the Does about the status of all three boys by the end of August.

Nor is this a case where the school district responded with half-hearted remedial measures. See, e.g., *Zeno*, 702 F.3d at 668–71 (finding deliberate indifference where school district repeatedly gave the same ineffective warnings in re-

sponse to known racial harassment). There was nothing half-hearted about the expulsion of the three boys. We do not mean to suggest here that expulsion of the harassers was the only reasonable disciplinary route. School-age bullies also have legal rights. See *Goss v. Lopez*, 419 U.S. 565 (1975). Federal law gives school officials wide discretion in making disciplinary decisions, especially as they have to balance the interests of all concerned. In this case, however, the forcefulness of expulsion certainly demonstrates how seriously the defendants took the boys' bullying of Doe once they learned its full extent.

The undisputed facts thus show that defendants' responses to the known acts of severe peer harassment suffered by Doe in this case were not deliberately indifferent. We affirm the grant of summary judgment for the defendants on Doe's Title VI and Title IX claims.

B. *Equal Protection Claim*

For Doe's equal protection claim to survive summary judgment, she needed to offer evidence that the defendants "acted with a nefarious discriminatory purpose … and discriminated against [her] based on [her] membership in a definable class." *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996) (citations omitted). In addition, she needed to offer evidence "that the defendants acted either intentionally or with deliberate indifference." *Id.* at 454; see also *Gant v. Wallingford Board of Education*, 195 F.3d 134, 140 (2d Cir. 1999) ("[T]o succeed on a claim [for peer harassment under the Equal Protection Clause], a plaintiff must show deliberate indifference on the part of the defendants themselves."); *Murrell*, 186 F.3d at 1249–51 (holding that teachers, administrators, and

school boards deny equal protection through deliberate in-difference to peer sexual harassment).

As we found above in the Title VI and Title IX deliberate-indifference analysis, the undisputed facts show that school administrators responded to known acts of bullying and harassment against Doe with prompt and escalating disci-plinary and preventive measures. A reasonable jury could not find that they acted with deliberate indifference to Doe's rights. Summary judgment on Doe's equal protection claim was appropriate as well.

The judgment of the district court is AFFIRMED.