# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————

No. 16-40093

—————

United States Court of Appeals
Fifth Circuit

**FILED**
May 2, 2017

Lyle W. Cayce
Clerk

K. S.; NEONDA NECOLE THOMAS, as next friend of K.S.,

Plaintiffs - Appellants

v.

NORTHWEST INDEPENDENT SCHOOL DISTRICT,

Defendant - Appellee

—————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:13-CV-188

—————————

Before ELROD, SOUTHWICK, and GRAVES, Circuit Judges.*

PER CURIAM:**

K.S., a sixth grader at the time of these events, claims he was subjected to student-on-student sexual harassment in violation of Title IX.  The district court, adopting the magistrate judge's report and recommendation, held that K.S. failed to create a fact issue on two essential elements of his Title IX claim and granted summary judgment.  We AFFIRM.

—————————

* Judge James E. Graves, Circuit Judge, concurs in the judgment only.

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-40093

## FACTUAL AND PROCEDURAL BACKGROUND

K.S.[1] was a sixth-grade student at Tidwell Middle School in Northwest Independent School District (the "District") for one semester, from September 2010 through January 2011. He alleges that, while at Tidwell, he was harassed because of his sex by a number of other students.

According to K.S., the harassment began shortly after he started at Tidwell. Many separate events make up his claim. Most center in some way on the fact that at that time he had large breasts. On the school bus, in the school hallways, in the PE locker room, and elsewhere, he was called names such as "titty boy" and "Teddy titty baby." In addition to name calling, students would touch and even twist his breasts in the PE locker room, the school hallway, and elsewhere.[2]

The school's principal, Mr. Conklin, and vice principal, Ms. McCormick, were made aware of incidents that occurred early on in the semester. Conklin told the PE coaches to be sure they were monitoring the locker room when students were changing, noting that the locker room "is a prime opportunity for students to misbehave or bully other students." K.S. was told he could go see the school counselor "Ms. Allred whenever [he] want[ed] to and that she would start helping [him] with the problems." Allred maintained this open-door policy throughout the year, and K.S. utilized it.

K.S.'s difficulties persisted throughout the semester. The perpetrators were at times disciplined, but not always. Sometimes K.S. was thought to be

---

[1] K.S.'s mother, Neonda Necole Thomas, brought this suit on his behalf. This opinion refers to them collectively as "K.S.," using the pronouns "he" and "him" rather than "they" and "them."

[2] In his declaration, K.S. says that students would laugh at him when he undressed, calling him "the blob," "jiggle puss," "gay," "faggot," "girl," "titty boy," or "jiggly puss." They would also tell him that he had "women's titties," among other things. When doing so, he says they would also pinch his breasts.

2

No. 16-40093

at fault, and he was disciplined. Sometimes both K.S. and others were disciplined for the same altercation. There were a few fairly intensive investigations in which multiple student statements were taken, which led to different variations of discipline.

On October 19, 2010, the District received a letter from K.S.'s attorney stating that K.S. "ha[d] been subjected to bullying on school grounds and on the school bus." The letter contained no suggestion that the harassment was sexual in nature or was based on K.S.'s sex.

The problems may have escalated in November 2010. In early November, three students verbally harassed and pushed K.S. as he walked to class. K.S. pushed back. Before the situation could escalate further, a teacher stepped in to stop it. Both K.S. and the student who pushed him were suspended. Finally, on December 15, K.S. was involved in a fight. A boy who had previously slapped K.S. on the bus ridiculed the way K.S. walked.[3] The boy told K.S. that "he could beat [him] up." Despite K.S.'s warning not to touch him, the boy grabbed his chest. K.S. then hit him. This fight, recorded on campus video, was the last incident of the semester. K.S. was suspended. The record is unclear whether and to what extent the other student was disciplined.

The next day, the school received letters from K.S.'s counselor and doctor describing his depression and its relation to "bullying at school" and the "harassment, teasing, and physical aggression from peers." His doctor further noted that his "depressive order [was] severe enough that it [was] impacting his level of functioning at school." Neither letter mentioned sex-based harassment.

---

[3] In late October and early November, K.S. told this boy, on multiple occasions, that he hoped the boy's father died. The boy's father had cancer.

No. 16-40093

K.S. identifies evidence that he says supports that his semester was affected by his depression and his difficulties with other students. K.S. says he changed in the bathroom to avoid the locker-room harassment and that he took alternate routes to class to avoid being harassed in the halls. He was absent or suspended for 17 full days of class, and he was partially absent for at least 15 other days. Some of the absences were suspensions and doctor's appointments; others were unexcused. The record does not contain evidence explaining many of these absences much less linking them to the bullying. In November, K.S. attempted suicide by taking five pills of Melatonin. Overall, his grades were not significantly affected. A grade in one class decreased somewhat significantly after the first grading period, but his grades in his other classes were essentially unchanged or improved slightly.

On January 4, 2011, the first day of the spring semester, the school decided to proceed with a psychological evaluation of K.S., told teachers to monitor K.S. both in the class and hallways, provided counselors to escort K.S. to and from the restroom, and required K.S. to sit behind the bus driver to avoid altercations on the bus. That same day, though, K.S. and his mother decided he would not return to Tidwell. On January 14, K.S. withdrew from Tidwell and moved to Louisiana.[4]

K.S. filed this suit in April 2013. In August 2014, he amended the complaint to allege only Title IX sex-based, student-on-student discrimination. Shortly thereafter, the District moved for summary judgment. On December 1, 2015, the magistrate judge recommended that summary judgment be granted because K.S. failed to raise a fact issue as to two elements of his Title IX claim:

---

[4] After withdrawing in 2011, K.S. filed three levels of grievances with the District, all of which were denied. Thereafter, K.S. also received a due-process hearing with a Texas Education Agency Hearing Officer. The Hearing Officer denied relief, finding, among other things, that the District investigated each incident of bullying reported by K.S.

4

No. 16-40093

(1) that K.S. was effectively barred access to an educational opportunity or benefit and (2) that the District was deliberately indifferent to known harassment.  K.S. did not file any objections.  On December 23, 2015, the district court adopted the magistrate judge's report and recommendation and entered judgment denying relief.  K.S. timely appealed.

## DISCUSSION

Our standard of review is controlled by the fact that there was no objection by K.S. to the magistrate judge's report and recommendation. Usually, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  When a district court adopts the report and recommendation after no objection was made, we review only for plain error.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).[5]  When we established that review standard, we added a caveat that the party claiming error on appeal after not objecting in the district court must have been "served with notice that such consequences will result from a failure to object."  *Id.* at 1429.  Here, the magistrate judge cited *Douglass* in his report and explained the effect of not objecting.  K.S. did not object.  We therefore review only for plain error.

To establish plain error, K.S. must show: (1) the magistrate judge erred, (2) the error was clear or obvious, (3) the error affected K.S.'s substantial rights, and (4) this court should exercise its discretion to correct such error because it seriously affects the fairness, integrity, or public reputation of

---

[5] Section 636(b)(1) was revised after *Douglass*.  We agree with the analysis of an unpublished opinion holding that the revision did not affect *Douglass*'s holding.  *Lampkin v. Bank of America, N.A.*, 644 F. App'x 366, 366–67 (5th Cir. 2016).

judicial proceedings. *See Lerner v. Freeh (In re: Deepwater Horizon)*, 824 F.3d 571, 583 (5th Cir. 2016).

We start with an overview of the legal regime under which this suit was brought. Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). "[S]tudent-on-student sexual harassment, if sufficiently severe, can . . . rise to the level of discrimination actionable under" Title IX. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). For the District to be liable for student-on-student harassment under Title IX, K.S. must show: (1) the school had actual knowledge of the harassment; (2) the harasser was under its control; (3) the harassment was based on his sex; (4) the harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] [his] access to an educational opportunity or benefit"; and (5) the school was "deliberately indifferent" to the harassment. *Id.* at 633, 646–47.

The error K.S. identifies on appeal is stated quite generally: the district court erred in granting summary judgment on the Title IX claim. Though not stated as separate issues, K.S.'s brief has a section setting out the evidence to support that the bullying and harassment were "severe and pervasive." There is a separate section of the brief making arguments that the District was deliberately indifferent. We consider those two as the specific issues raised on appeal. Unless K.S. shows plain error on both issues, we must affirm. Our review of the record convinces us that the district court did not plainly err at least in holding there was no genuine issue of material fact as to deliberate indifference. As a result, we will set out only our analysis of that issue.

To prevail on a student-on-student Title IX claim, a plaintiff must show that a school which received federal funds was "deliberately indifferent" to

sexual harassment "of which [it] ha[d] actual knowledge." *Id.* at 650. Deliberate indifference "is a high bar, and neither negligence nor mere unreasonableness is enough." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011). Rather, a school's response must be "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Under this standard, a school's response need not be effective in remedying the harassment, and no particular remedial action is required. *Sanches*, 647 F.3d at 168. We are to "refrain from second-guessing the disciplinary decisions made by school administrators," who "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 648, 649. On summary judgment, it is appropriate for a court to characterize "a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

K.S. makes two main arguments concerning deliberate indifference. He first argues that the District's responses to the harassment were so ineffective as to be clearly unreasonable. He also argues that the District's failure to follow its own policies and the federal Office for Civil Rights guidelines constitutes deliberate indifference.

We examine two of our precedents on these points. First, we have held that a school district was not deliberately indifferent to severe and pervasive racial harassment when it "took some action in response to almost all of the incidents noted by Plaintiffs." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015). The district there took some "relatively strong action to address the most egregious incidents." *Id.* For example, the district allowed a plaintiff to park in the teacher's lot and work in the counselor's office after a noose was found near her car in the school parking lot; it provided another plaintiff with an aide to walk her to school. *Id.* We also described students being suspended for calling a plaintiff "stupid n---er" a "strong action." *Id.*

7

Other responses, though, were "relatively weak," such as when the district merely reprimanded students after they put a shoelace noose in a plaintiff's gym locker. *Id.* at 411. Still, we held the district's weaker responses, even if "concerning," were "not tantamount to [the district] intentionally 'subjecting its students to harassment.'" *Id.* (quoting *Davis*, 526 U.S. at 644) (alterations omitted). "Because some action was taken in an attempt to address each of these issues, these incidents [did] not create a genuine issue of material fact as to deliberate indifference." *Id.*

Like in *Fennell*, the District here took some action in response to the specific incidents alleged by K.S. and to the overall situation. *See id.* at 410. Throughout the semester, the District investigated and took action when K.S. or his mother complained or when K.S. was involved in an altercation. Often, after investigation, it reprimanded or talked to the students involved, and it sometimes suspended them. In *Fennell,* we called suspending students for misconduct a "relatively strong action." *Id.* Here, school officials also attempted to talk with K.S. and the other students involved in an effort to help them get along.

It is true that K.S. was sometimes one of the students suspended as a result of the District's investigations. Yet the record does not contain evidence that all or even most of K.S.'s suspensions were linked to sex-based harassment, which is the only type of harassment relevant to our inquiry. Instead, the magistrate judge found that most of K.S.'s suspensions were a consequence of his own misconduct. K.S. did not object to that finding, and it is not plainly erroneous. Similarly, the record does not indicate that K.S. was suspended simply for defending himself from sex-based harassment. The magistrate judge found that he was suspended due either to his insubordination or to his own contribution to the altercations with his peers. K.S. did not object to this finding either, and it is not plainly erroneous. In

summary, the record does not show that the District was aware of numerous incidents of sex-based harassment but failed to respond.

Moreover, although its response was preempted by K.S.'s decision to withdraw from Tidwell, the District took relatively strong action to deal with the overall situation. That is, before the start of the spring semester, after receiving letters from K.S.'s doctor and counselor, the District decided to move forward with a psychological evaluation of K.S., told teachers to monitor him at school, provided counselors to escort him to and from the restroom, and required him to sit behind the bus driver to avoid altercations on the bus.

K.S. argues that the declaration he offered as evidence on summary judgment supports that he complained far more often than the District responded. The declaration states that he went to Principal Conklin's office "one to two times a week" to report various types of harassment, but the principal and others did not respond to many of those complaints. We agree with the district court that the claim constitutes a generalized and unsupported statement of fact. Similar to what we held in *Fennell*, these generalized statements do not create a genuine dispute of material fact that school officials were deliberately indifferent. *See id.* at 411. Without knowing the specific incidents, what was told to Principal Conklin or other school administrators, and exactly what the response was, K.S.'s argument fails for lack of supporting facts.[6] *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990); *see also Fennell*, 804 F.3d at 411.

---

[6] Likewise, K.S.'s statements that he was harassed "repeatedly," "constantly," and "almost every day," cannot serve to avoid summary judgment. For his part, the magistrate judge denied the defense motion to strike the declarations of K.S. and his mother. Insofar as the generalizations conflicted with the deposition testimony, however, he "agree[d] that a party generally cannot defeat summary judgment by offering an affidavit that conflicts with prior deposition testimony." As to the "alleged vague, conclusory, self-serving language such as 'repeatedly,' 'often,' [and] 'several occasions,'" he found that the summary-judgment evidence "speaks for itself."

No. 16-40093

There were also inconsistencies between some of the general and the more specific claims. For example, K.S. includes chest-grabbing in his declaration as a type of harassment he reported to Conklin "one to two times a week." Yet his deposition makes clear that he did not report chest-grabbing incidents on a weekly basis:

Q. Okay. So you've described three different incidents of you being touched on the breast.

A. Yes.

Q. And you can't recall any other ones; right?

A. No, sir.

Q. Okay. One we know about because that's the one that was investigated about the bus; right?

A. Yes, sir.

Q. And that girl who touched you on the — on the breast was disciplined; correct?

A. Sort of, yeah.

Q. And then these other two incidents that you just told me about, have you ever told anybody about those incidents before?

A. My mom.

Q. Okay. Did you tell anyone at school about those incidents?

A. No, sir.

Generalizations that are contradicted by deposition testimony will not prevent summary judgment. "It is [also] well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *see also Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007). Aside from these

supposedly constant, yet unspecified, incidents and reports, K.S. does not point to any specific incidents of harassment that were not investigated.[7]

It is clear, then, that the substance of K.S.'s argument is not that the District did not respond, but that its response was ineffective. Indeed, K.S. acknowledges that "[t]here is no doubt that [the District] investigated a number of incidents," and that when it "did investigate, [it] often responded appropriately." "School officials are given broad latitude to resolve peer harassment," and thus a district is liable only when its responses to such harassment are clearly unreasonable in light of known circumstances. *Fennell*, 804 F.3d at 411 (quoting *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014)). The District cannot be liable because its disciplinary choices were not effective. Nor will "[m]ere negligence . . . suffice." *Id.* at 410.

Nothing here suggests the responses were so unreasonable so as to satisfy the "high bar" this standard imposes. *See Sanches*, 647 F.3d at 167. The District disciplined students and responded to every instance of harassment specifically identified in the record. It investigated K.S. and his mother's complaints, often intensively. Even if the District was incorrect in some of its findings that K.S. was the instigator, and we do not know that it was, such would reflect only the difficulties of fact-finding — not indifference. "Title IX does not require flawless investigations or perfect solutions." *Id.* at 170. Even when a school's efforts are ineffective, the responses need to have

---

[7] In his deposition but not in his briefing, K.S. says the District did nothing after two additional incidents: the mushroom-throwing fight and the incident after which the coach told him not to run home to his mother. It is clear, though, that something happened following these incidents. *See Fennell*, 804 F.3d at 410–11. Initially, the record does not support that the mushroom-throwing fight was related to K.S.'s sex. Even if it were, the school talked to both boys about how to avoid conflict in the future but punished neither. Likewise, the coach who made K.S. do sit-ups and told him not to cry home to his mother was admonished for his unprofessionalism. At his mother's request, K.S. was also taken out of PE until she could meet with the school.

been clearly unreasonable in light of the allegations. *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 384, 388–89 (5th Cir. 2000). Perhaps, as K.S. argues, the District should have taken swift and decisive action to remedy what K.S. now claims is sex-based harassment,[8] "but such an allegation would sound in negligence, not deliberate indifference." *See Sanches*, 647 F.3d at 170 (quotation marks omitted). We agree there is no genuine dispute of material fact that the District's responses, even if ineffective, were not clearly unreasonable.

K.S. also argues that the District failed to follow its own procedures and the federal Office for Civil Rights guidelines regarding sexual harassment. We rejected a substantially similar argument in *Sanches*. *See id.* at 169–70. There, the plaintiff "claim[ed] the district was deliberately indifferent because it failed to follow its own procedures regarding sexual-harassment complaints." *Id.* at 169. The harassment policy, she claimed, required the principal to contact the Title IX coordinator or superintendent following allegations of harassment, "and [the school's] failure to do so [was] evidence of deliberate indifference." *Id.* We disagreed, noting the Supreme Court had already rejected this argument. *Id.* (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291–92 (1998)). Indeed, in *Gebser*, the Court said that "failure to comply with [federal] regulations . . . does not establish the requisite . . . deliberate indifference." *See Gebser*, 524 U.S. at 291–92. The Court has never held "that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements." *Id.* at 292.

---

[8] K.S. now claims he reported chest-grabbing and name-calling constantly, but neither he, his mother, his lawyer, his doctor, nor his counselor referenced anything that should have alerted the District to anything more than middle-school bullying. The District's disciplining and talking to students for bullying — and for getting into fights — was not a clearly unreasonable response to the conduct it knew about.

No. 16-40093

Even if the District failed to follow guidelines from the Office for Civil Rights or even its own policies, deliberate indifference is not thereby shown.

The district court did not plainly err when it determined that K.S. failed to raise a genuine issue of material fact as to whether the District was deliberately indifferent to known harassment.

AFFIRMED.