OPINION OF THE COURT
James Hudson, J.
“We despise and abhor the bully, the brawler, the oppressor, whether in private or public life.”
The eloquence of Theodore Roosevelt reminds us that the peculiar phenomenon known as bullying has long been an affliction of society. The case at bar involves a discussion of the remedies for same in the context of a child who suffered bullying at a public school.
Initially, the court would like to thank and commend Messrs. Schaefer and Venator for their eloquent and scholarly arguments on behalf of their respective clients.
This is a special proceeding pursuant to article 4 of the CPLR. Petitioners Paul T. and Annita T. are the parents of an infant (hereinafter referred to as J.T.), alleged to be a student with a disability under the Individuals with Disabilities Education Act (hereinafter referred to as IDEA) and the New York Education Law. The gravamen of petitioners’ claim is that respondent school was obliged to classify J.T. as IDEA eligible and is obligated to reimburse parochial school tuition for the 2011-2012 and 2012-2013 school years. Petitioners challenge the decision of the State Review Officer (hereinafter referred to as SRO) dated August 28, 2014. In turn, this decision rejected the administrative appeal of the findings of fact and final order of the Impartial Hearing Officer (hereinafter referred to as IHO) dated June 15, 2014, which refused to overturn the school’s decision not to classify J.T. as eligible under the IDEA. In our analysis of the petitioners’ and respondents’ arguments we have reviewed the decisions of the State Review Officer and the Impartial Hearing Officer. The court also reviewed the 483 pages of hearing transcripts as well as the exhibits introduced during the hearing (District’s exhibits 1-15; parents’ exhibits A-Q; IHO’s exhibits I, II).
*233 The precipitating incident to this case occurred in April of 2011. After his/her* fifth grade art class, J.T. was discovered to have drawn, in his/her personal journal, a picture of someone committing acts of violence against another. This other person was purportedly another student who J.T. felt had continually harassed him/her. The pictures in the book led to a disciplinary proceeding against him/her (Education Law § 3214). It was settled by a stipulation where the South Huntington Union Free School District (District) agreed to withdraw the hearing in consideration of J.T.’s parents not returning him/her to school “until such time as a psychiatric clearance has been granted to the student by a District-provided evaluator.” (Parents’ exhibit Q.) J.T. did not return to the public school. He/she was unilaterally placed in a private school by his/her parents.
J.T.’s parents then requested the respondent District to consider an application to have J.T. deemed eligible for special education services. On August 18, 2011, the District Committee on Special Education (hereinafter referred to as CSE) met to consider this request but ultimately decided that J.T. did not qualify. Petitioners appealed this decision to the Impartial Hearing Officer.
The IHO began hearing the matter on August 26, 2013. Respondent District contended “that the School District’s Committee on Special Education appropriately determined on August 18, 2011, that J.T. did not qualify for Special Education services.” (Tr at 10.)
The District’s first witness called was Dr. Matthew Krivoshey, the director of special education for respondent District. He described his academic professional background as being in possession of a Master’s degree in school psychology from Queens College; a Master’s degree in education from Queens College; a Doctorate in school psychology and child clinical psychology from Yeshiva University; and a Master’s degree in school district administration from Dowling College. Included in Dr. Krivoshey’s testimony was information relating to various exhibits:
*234 District’s Exhibit 1
is a report from Ms. Allison Bruno (assistant principal of Maplewood School) detailing the circumstances leading to J.T.’s suspension.
District’s Exhibit 2
is Dr. Edelman’s psychiatric evaluation of J.T. In this report, Dr. Edelman declined to diagnose any psychiatric condition. He did, however, make “note of some sort of attention or focusing difficulty, although not rising to the level of diagnosis.” (TV at 28.) He also writes,
“J.T. is a ten-year-old young [person] referred for psychiatric evaluation for reasons as noted above in the recent referral section of this report. Through review of the information supplied today as well as interview with J. and his/her mother as well as information obtained from his/her psychotherapist, Mr. Groden., J. presented as an individual who feels as if he/she’s not being treated fairly by his/her peers, and he/she oftentimes references this to what he/she feels are ethnic/racial differences. It does appear, however, as if J. may be somewhat easily irritated by others at times and that perhaps, he/ she has become somewhat of an easy target to others.” (TV at 60.)
Dr. Edelman also wrote: “If J. does return to his/her current school environment, I would recommend that he/she be considered a candidate for in-school counseling to help him/her deal with the school environment and situations that arise.” (TV at 66.)
District’s Exhibit 3
is a “request for evaluation” for J.T. made by his/her parents. In addition to the request for evaluation, the request spoke to “issues of bullying taking place in the school” (tr at 29). It reads in pertinent part:
“With regard to our concerns concerning the incidents of bullying in particular, because of our past experiences with the school administration at Maplewood, we have a substantial concern that whatever remedial action may result from this request will not be sufficient to stop the bullying, teasing and taunting of our [child] to the extent necessary to insure that he/she is afforded a free appropriate public education. In an abundance of caution, therefore, we are also informing the *235 District by letter of this date to Jim Kaden, President of South Huntington Schools’ Board of Education of our intention to enroll J. at a nonpublic school within the District, St. Patrick’s School, 360 Main Street, Huntington, New York 11743 for the 2011-‘12 school year and that we are requesting that the District reimburse us for the resulting cost of that enrollment including but not limited to tuition and related service costs.” (Tr at 52.)
District’s Exhibit 4
is a letter written by deputy superintendent Ms. Jacqueline Harris to J.T.’s parents to begin the evaluation process in order to determine if J.T. required special assistance. (Tr at 31.)
District’s Exhibit 5
is the signed consent from J.T.’s parents to allow the evaluation to go forward. (Tr at 31.)
District’s Exhibit 6
is a document titled a “Social History,” prepared by one of respondent District’s social workers, Mr. David Perkins. The social history is a comprehensive work which “allows the CSE to have a report of important developmental milestones, to take a look at development, to examine other psycho-social factors, such as factors within the family or the community which may also affect the child’s ability to learn within the classroom.” (Tr at 32.) The social history indicated that J.T. enjoyed “fairly good academic progress.” It acknowledged that J.T.’s parents had made complaints of J.T. being bullied but stated “that hadn’t been substantiated or seen within the school.” (Tr at 32-33.)
District’s Exhibit 7
is the psychological and educational evaluation that was performed by the District school psychologist, Dr. Savoy, on J.T. This report indicated that J.T. was administered the “Wexler intelligence test for children, which is an appropriate test to be administered to children of his/her age.” It further demonstrated that J.T. scored between average to high, depending on the category tested, in particular to areas “closely correlated with academic performance,” and “These are relatively well developed scores that indicate good levels of functioning.” (Tr at 34-35.) District’s exhibit 7 also indicates that J.T. also scored very well on the Kaufman test, which was administered to gauge the child’s educational performance. Dr. Krivoshey’s comment on J.T.’s test results is as follows: “Most important *236 what we see here is no academic weaknesses evident and actually many areas of strength.” (Tr at 36.) This led the witness to observe that a student in J.T.’s position “is able to learn and is progressing appropriately, at least when compared to the same age peers.” (Tr at 36-37.) Exhibit 7 also contains a parental report prepared by J.T.’s parents. The parental report “had indicated significant levels of hyperactivity, anxiety, of depression, of internalizing problems, which is something that sometimes goes hand in hand in anxiety and depression, as well as behavioral symptoms index score that was in the clinically significant range.” (Tr at 38.)
District’s Exhibit 8
is J.T.’s report card from the 4th grade, which indicates that overall, J.T. was doing well academically.
District’s Exhibit 9
is J.T.’s report card from the 5th grade. This indicates that “the lowest score he/she received was proficient, highest being advanced.” (Tr at 40.)
District’s Exhibit 10
is a card from J.T.’s file in which his/her standardized test scores from 4th grade had been summarized.
District’s Exhibit 11
is the sign-in sheet of the CSE meeting which discussed J.T.’s parents’ application on August 18, 2011. In attendance were Dr. Krivoshey, Dr. Savoy, Ms. Regan, a special education teacher at the Maplewood School, J.T.’s mother, Mr. Perkins, the social worker, Mr. Gaetano Greco, J.T.’s classroom teacher for the 2010-2011 school year, and finally counsel for J.T., Mr. Schaefer and counsel for the District, Mr. Kwee.
After receiving the aforementioned exhibits, the IHO allowed Dr. Krivoshey to be questioned as to what was discussed at the CSE meeting:
“We reviewed the psychological evaluation ... as well as the educational component . . . [w]e had reviewed the information from the social history that was relevant, including parent concerns. We had also reviewed his/her school performance as related by Mr. Greco, his/her classroom teacher. In addition, we also reviewed the contents of the records with respect to standardized testing done in the District, as well as the report cards. I believe that was it.” (Tr at 44.)
*237 After discussion of the aforementioned information, the CSE determined that J.T. was not eligible for special education (tr at 45). The reason for this was “there seemed to be no academic impact with respect to any of the issues raised. There was no evidence of a disabling condition. He/she just didn’t seem to meet the criteria for classification in any way.” (Tr at 45.) Dr. Krivoshey stated that there was no evidence of any learning disability on the part of J.T. nor did he/she appear to fit the criteria for “other health impaired” (tr at 45). Based on parental concerns, however, the CSE directed that a neuropsychological evaluation take place. That was performed but it did not indicate any information which Dr. Krivoshey felt would disturb the finding of the CSE (tr at 48). In the meantime, J.T.’s parents had enrolled him/her in St. Patrick’s parochial school.
Upon cross-examination, Dr. Krivoshey was asked,“Q: Dr. Krivoshey, my question is when you got this letter in July of 2011, what was your understanding, if any, as to whether or not bullying might result in a denial of a free appropriate public education?”
He answered:
“With respect to Part 200 of the educational regulations, my understanding would be whatever — if the bullying resulted in emotional disturbance, under Part 200, then the student would be eligible for classification or for that matter, any other sort of issue that might arise from the bullying that would allow for classification. So I guess specifically not the bullying per se, but the emotional status of the child.” (Tr at 56.)
Dr. Krivoshey also acknowledged he was familiar with the “Child Find Obligation” under the IDEA (i.e., the District’s responsibility to actively seek out IDEA eligible students and supply them with evaluations).
Petitioner’s counsel also introduced certain exhibits via the testimony of Dr. Krivoshey.
Parents’ Exhibits A and B (an Email Chain)
were a series of communications between J.T.’s mother and J.T.’s teacher, Mr. Greco, in 2011. Dr. Krivoshey indicated that he had spoken to Mr. Greco regarding J.T. Mr. Greco stated to him that J.T. “was a good student, generally not a behavior problem, and he hadn’t personally seen any signs of bullying.” (IV at 82.)
*238 Parents’ Exhibit C
is two pages from an email chain dated April 27, 2011: Dr. Krivoshey was asked the following concerning the CSE meeting of August 18th:
“Q: Now, at that meeting, there was no discussion regarding the impact of any, if any, of any bullying J. had endured with regard to determining his/her eligibility for Special Education services; isn’t that true?
“A: Well, what would have been discussed was his/ her emotional state. I don’t think you could equate bullying to emotional state. So no, I guess would be the answer. The issue of bullying is — having been bullied as a classified issue, no.
“Q: No what; no, it was not discussed or no, it was?
“A: No, it wasn’t discussed because it didn’t relate to classification, not directly.” (Tr at 86-87.)
The witness also explained the import of parents’ exhibit F (tr at 88-89). This is a letter indicating that J.T. requires academic intervention services (hereinafter referred to as AIS) from the Maplewood School. The purpose of an AIS letter is a warning that a student either is or is in danger of falling below acceptable academic standards. Read in conjunction with District’s exhibit 10, it gives signs that J.T.’s academic performance was in danger of being considered substandard. (Tr at 90.) Dr. Krivoshey was also shown:
Parents’ Exhibit G
which was a report (dated Sept. 24, 2011) from a Doctor Stavrou. The report indicated that J.T. suffers from attention deficit hyperactivity disorder, inattentive type. This report was received by the District some time after it was prepared. The CSE had made it’s determination rejecting J.T.’s application in August. After receiving this report, however, the CSE did not reconvene (tr at 92). The reason that the CSE did not meet to discuss this new information is related as follows: “The presence of Attention Deficit Disorder (hereinafter referred to as ‘ADHD’) in and of itself doesn’t indicate a classifiable condition. It doesn’t make a student eligible for Other Hea[l]th Impaired. It has to make an impact on the student’s performance. We determined that the student was progressing satisfactorily.” (Tr at 92-93.)
Dr. Krivoshey was later recalled to explain a discrepancy in J.T.’s fourth quarter fifth grade report card. It was missing *239 grades and Dr. Krivoshey stated that he inquired of the home instruction tutor, Ms. McQueen, who informed him that J.T. had performed satisfactorily in all areas. (Tr at 241.)
The District also called Mr. Gaetano Greco to testify. Certified in elementary, special and Italian education, Mr. Greco has been a teacher at the District for approximately 10 years. (Tr at 98.) J.T. was one of about 24 students in Mr. Greco’s fifth grade class during the 2010-2011 school year. In describing J.T. he states
“Generally J. was a good student. He/she was focused in class. Socially he/she did have friends in the classroom who did share the same interests, common interests that you would normally see as a fifth grade student ... As far as being a bright student, he/she got along well with others socially, and he/she would — he/she was very eager to please, I would say, as a child. He/she responded very well to positive praise.” (Tr at 100.)
Mr. Greco further described him/her as being in the top half of the class (tr at 101). After a communication with J.T.’s mother, Mr. Greco moved the child to a seat at the front of the class. Mr. Greco read from J.T.’s report card which confirmed J.T.’s overall progress while noting concern over being distracted and not achieving full potential. Mr. Greco also indicated, however, that J.T. was not in class for most of the fourth quarter because of a “behavioral incident.” (Tr at 108.) J.T. received a home-bound tutor who helped J.T. with lessons prepared by Mr. Greco. Mr. Greco was also one of the participants in the CSE that met on August 18, 2011. When asked if J.T. qualified for special services, Mr. Greco answered in the negative: “Because [he] felt like J. didn’t fall in that range academically and socially.” (Tr at 110.)
On cross-examination, Mr. Greco was questioned on the subject of J.T. being bullied in class. He answered that in response to a query from J.T.’s mother, he looked into the allegation. He indicated that he was not aware of J.T. being the subject of bullying. He learned of an incident between J.T. and another child, but described it as “bickering” and not bullying. (Tr at 124.)
Dr. Carol Savoy, school psychologist, who performed the psychological evaluation of J.T. was called to give testimony (tr at 205). Dr. Savoy stated, inter alia, that she prepared the evaluation entered into evidence as District’s exhibit 7. She reiterated that J.T.’s academic performance was at least average *240 to high average and in one area, superior. (Tr at 210-215.) Dr. Savoy acknowledged being informed of J.T. suffering from ADHD symptoms and recommended that “the school should consider providing the in-school counseling and mediation to help him/her get along — to help him/her with that girl he/she was having trouble with and perhaps alleviate feelings of anxiety and isolation.” (Tr at 218.) Based upon her overall evaluation of J.T. and review of his/her school records, the report of Dr. Edelman and notes from J.T.’s parents, Dr. Savoy gave the following opinion:
“J. did not demonstrate the — a disability, either a learning disability or any problems that would rise to the occasion — rise to the level of a disability, nor did he/she — was there any evidence for a disability or any problems that he/she was having impacting his/her education, his/her school performance in any way. The school performance, if you look at his/ her report card, was at least average.” (Tr at 220.)
On cross-examination, Dr. Savoy conceded that J.T. suffered from anxiety, depression and some symptoms of ADHD. She added, however, that J.T. did not experience these to a marked degree and specifically “they were not to a degree that meet the criteria of ADHD, of a diagnosis, or interfering with his/her ability to learn and his/her academic performance.” (Tr at 231.)
Petitioner Annita T. (hereinafter referred to as Ms. T.), mother of J.T., also testified. She indicated that beginning in the 2008-2009 school year, J.T. was subjected to bullying that resulted in his/her demeanor changing at home. He/she became “very angry, rude and starting to hit his/her sister.” (Tr at 343.) Ms. T. brought J.T. to a therapist, Mr. David Groden who began counseling him/her. Ms. T learned that J.T. was being harassed and that his/her property (e.g., pencils, pencil cases and money) was being taken from him/her. Concerned for her child’s welfare, Ms. T. initially discussed this problem with J.T.’s third grade teacher, Ms. Huckquinn as well as the assistant principal. Dissatisfied with their responses, Ms. T. contacted the school in December of 2008 and complained of the harassment J.T. was being subjected to, as well as what she perceived was the lack of an adequate program on the part of the school to address bullying (parents’ exhibit B). Ms. T. also testified that J.T. was subjected to racial epithets by other students (tr at 349-350). The harassment was not merely verbal. On some days, J.T. came home with bruises and on two occasions with a *241 bloody nose. She learned via Mr. Groden, that these injuries were the result of altercations with other students primarily on the school bus. (TV at 357.) In fifth grade, J.T. was continually subjected to ridicule by two girls in J.T.’s class to such an extent that J.T. was frequently reduced to tears (tr at 360). Ms. T. also related that the April 2011 incident which was the cause of J.T.’s suspension was the culmination of bullying by the two girls and what Ms. T. perceived as the indifference of the District. Based upon what she felt was the shortcomings of the District to address J.T.’s needs and her own concerns, she enrolled him/her in a local parochial school.
Based upon the foregoing testimony and exhibits, the Impartial Hearing Officer issued his findings of fact and final order (hereinafter referred to as final order) on June 15, 2014. The final order is a comprehensive, 32-page document which begins with the following premise: “Being bullied is not itself a legally recognizable disability ... It must rise to the level of adversely impact educational performance” (final order at 3). The IHO set forth a two-part analysis. First: whether the respondent District “met it’s burden of showing that its eligibility denial was factually reasonable,” and second: if the District acted incorrectly, have J.T.’s parents “met [their] correlative burden of demonstrating that the private placement they have opted for in light of the district’s error appropriately addresses the child’s individual needs under the IDEA” (final order at 3). The IHO examined the evidence to address petitioners’ contention that J.T. was emotionally disturbed as a result of being bullied and that his/her ADHD was exacerbated by bullying to the point of making him/her “other health impaired” or “learning disabled” (final order at 3-4). The IHO searched the record for evidence, specifically “clinical support for an independent connection of the behaviors to a specific disability” (final order at 5). He referred to and quoted (at great length) examination reports of Dr. Edelman, Dr. Savoy and Dr. Stavrou. After a lengthy discussion of the testimony and exhibits, he found no evidence of disability on J.T.’s part and determined that the ineligibility determination of the District was correct.
Petitioners took an appeal of the IHO’s final order (Education Law § 4404 [2]; 20 USC § 1415 [g] [1]; 34 CFR 300.514 [b] [1]; 8 NYCRR 200.5 [k]). Upon review of the underlying proceedings, the SRO gave his decision on August 28, 2014. The SRO concurred with the IHO’s finding that it was not sufficiently proved that J.T. had been the victim of bullying. This *242 did not end the discussion. The SRO proceeded to review, in great detail, J.T.’s parents’ contentions of a pattern of bullying that resulted in J.T.’s educational performance coming, at one time, to a “complete halt.” (SRO decision at 6.)
“The parents specifically assert that the student presented with a ‘generally pervasive mood of unhappiness or depression’ (8 NYCRR 200.1 [zz] [4] [iv] and/or demonstrated an ‘inability to build or maintain interpersonal relationships with peers and teachers’ (8 NYCRR 200.1 [zz] [4] [ii]). However, the evidence does not support the parents’ position that the student exhibited either of these characteristics required for a classification of an emotional disturbance” (SRO decision at 11).
The SRO emphasized that the initial discussion of J.T. suffering from depression was “based on parental reporting and was not also professionally diagnosed” (SRO decision at 11). In concluding that J.T. could not be considered emotionally disturbed, the SRO noted the testimony at the CSE hearings which indicated J.T. was a well adjusted child who appeared to enjoy school, was well behaved and well liked by other students (SRO decision at 12, referring to tr at 100, 104, 107, 161, 213; District’s exhibits 6, 7, 9).
The SRO next analyzed the IHO’s finding that J.T. was not “a student with an other health impairment” (SRO decision at 12). The SRO reviewed the relevant portions of the record and exhibits (District’s exhibit 2 at 5; exhibit 6 at 2; exhibit 7 at 5) and concurred with the IHO that there was insufficient information at the August 2011 CSE to determine if J.T. suffered from an other health impairment warranting his/her classification for special education (SRO decision at 13).
The SRO, assuming for the sake of argument that J.T. met the criteria for either emotional disturbance or “other health impairment,” considered if his/her condition(s) adversely affect his/her educational performance (34 CFR 300.8 [c] [4] [i]; [9] [ii]; 8 NYCRR 200.1 [zz] [4], [10]). After three pages of considerable analysis of the facts and applicable law, the SRO concluded: “In summary, the hearing record indicates that, notwithstanding the evidence of the student’s social/emotional and attentional needs, the district properly concluded that the student’s concerns did not have an adverse impact on his/her educational performance.” (SRO decision at 15.)
Finally, the SRO considered the question of whether the District had violated the “Child Find” provision of the IDEA in *243 its treatment of J.T. or that the CSE should have reconsidered its decision in light of the September 24, 2011 neuropsychological evaluation. After answering this question in the negative, the SRO concurred with the District’s determination to deny J.T.’s parents’ application for special education.
Subsequent to the SRO’s decision, the instant petition was filed. Petitioners contend that the findings of the SRO are not supported by a preponderance of the evidence and must be reversed.
The practice known as school bullying is such a pernicious social evil that the law allows it to be addressed in several ways.
The aberrant actions of a bully, if they constitute an assault, menacing or criminal mischief under Penal Law §§ 120.00, 120.15 and 145.00, respectively, may be the basis of a charge of juvenile delinquency in the Family Court (Family Ct Act art 3; § 301.2). Moreover, the child who is subjected to such antisocial behavior on the basis of his/her ethnic or racial background may find solace in that provision of the law governing hate crimes (Penal Law § 485.05; Matter of Mondy E., 121 AD3d 785 [2d Dept 2014]). Racial, gender and disability motivated harassment/bullying is also actionable under title VI and title IX of the Civil Rights Act (see Zeno v Pine Plains Cent. Sch. Dist., 702 F3d 655 [2d Cir 2012]; 42 USC § 2000d; T.K. v New York City Dept. of Educ., 779 F Supp 2d 289 [ED NY 2011]). In T.K. v New York City Dept. of Educ., Judge Weinstein noted (as obiter dictum) that schools may be under an obligation to protect students from bullying under the Due Process Clause (id. at 307).
A school may be appropriately held liable in tort for a bully’s acts if it is found that the school failed “to adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision” (Smith v Poughkeepsie City School Dist., 41 AD3d 579, 580 [2d Dept 2007], quoting Mirand v City of New York, 84 NY2d 44, 49 [1994]; see Shante D. v City of New York, 83 NY2d 948, 950 [1994]; Siller v Mahopac Cent. School Dist., 18 AD3d 532, 533 [2005]).
In 2012, the state legislature observed:
“Bullying, harassment and discrimination pose a serious threat to all students, including but not limited to students targeted because of actual or perceived race, color, weight, national origin, ethnic *244 group, religion, religious practice, disability, sexual orientation, gender or sex. It is imperative to protect every student from such harm regardless of whether the student is a member of a specific category.” (2012 McKinney’s Session Law News of NY, No. 3 at 730 [Aug. 2012] [L 2012, ch 102, § 1].)
The Dignity for All Students Act was promulgated and declared that
“[t]he legislature finds that students’ ability to learn and to meet high academic standards, and a school’s ability to educate its students, are compromised by incidents of discrimination or harassment including bullying, taunting or intimidation. It is hereby declared to be the policy of the state to afford all students in public schools an environment free of discrimination and harassment. The purpose of this article is to foster civility in public schools and to prevent and prohibit conduct which is inconsistent with a school’s educational mission” (Education Law § 10).
In furtherance of this espoused purpose, school districts are now (the Act was added by L 2010, ch 482, eff July 1, 2012 and amended by L 2012, ch 102, eff July 1, 2013) obliged to formulate strict policies dealing with bullying, mandate reporting by teachers and other employees, and compile statistics of same.
The parents of J.T. elected to proceed exclusively under the IDEA and the companion New York Education Law. The question before the court is to what extent the IDEA concerns itself with and protects a bullied student in general and how it applies to J.T.’s case in particular.
Prior to determining whether the SRO applied the IDEA correctly to J.T.’s case, the court must set forth its standard of review. In a CPLR article 4 proceeding, the SRO decision must be supported by a preponderance of the evidence (Matter of Board of Educ. of Hicksville Union Free School Dist. v Schaefer, 84 AD3d 795 [2d Dept 2011]; Matter of Pawling Cent. School Dist. v New York State Educ. Dept., 3 AD3d 821 [3d Dept 2004]). It should be noted, however, that since the instant controversy involves the initial decision of whether the child was properly classified as nondisabled, “no deference” is due to the administrative determination and the court may review the record de novo (A.J. v Board of Educ., 679 F Supp 2d 299, 305 [ED NY 2010]; Eschenasy v New York City Dept. of Educ., 604 F Supp 2d 639 [SD NY 2009]).
*245 The purpose of the IDEA is “to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs” (Begley v City of New York, 111 AD3d 5, 24 [2d Dept 2013], citing 20 USC § 1400 [d]; see Matter of Northeast Cent. School Dist. v Sobol, 79 NY2d 598, 603 [1992]). The IDEA must be distinguished from the Rehabilitation Act since the petition before us is concerned exclusively with the former. The Rehabilitation Act is broader in coverage than the IDEA in that it extends its protections for children with disabilities to include “individuals who are regarded as having such a disability (whether or not that perception is correct)” (Maus v Wappingers Cent. School Dist., 688 F Supp 2d 282, 288 [SD NY 2010]; Individuals with Disabilities Education Act §§ 601 [d] [1] [A]; 602 [3] [A] [Pub L 91-230, tit VI, 84 US Stat 175, as amended], codified at 20 USC §§ 1400 [d] [1] [A]; 1401 [3] [A]; Rehabilitation Act of 1973 § 504 [a] [Pub L 93-112, tit V, 87 US Stat 355, as amended], codified at 29 USC § 794 [a]). Both the IDEA and the Rehabilitation Act, however, “place upon schools the affirmative duty to address bullying and harassment” (T.K. v New York City Dept. of Educ. at 308).
The IDEA defines a “child with a disability” as “a child . . . with [inter alia] . . . serious emotional disturbance . . . , other health impairments, or specific learning disabilities; and . . . who, by reason thereof, needs special education and related services.” (C.B. ex rel. Z.G. v Department of Educ. of City of N.Y., 322 Fed Appx 20, 21 [2d Cir 2009], quoting 20 USC § 1401 [3] [A].)
The term “Emotional disturbance” (20 USC § 1401 [3] [A]; 34 CFR 300.8 [a] [1]) requires one or more of the following criteria:
“(i) an inability to learn that cannot be explained by intellectual, sensory, or health factors;
“(ii) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
“(iii) inappropriate types of behavior or feelings under normal circumstances;
“(iv) a generally pervasive mood of unhappiness or depression; or
“(v) a tendency to develop physical symptoms or fears associated with personal or school problems.” (8 NYCRR 200.1 [zz] [4]; 34 CFR 300.8 [c] [4].)
*246 “Other health impairments” are defined as:
“having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems, including but not limited to a heart condition, tuberculosis, rheumatic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia, diabetes, attention deficit disorder or attention deficit hyperactivity disorder or tourette syndrome, which adversely affects a student’s educational performance.” (C.B. ex rel. Z.G. at 21 [some emphasis added and some emphasis omitted], citing 20 USC § 1401 [3] [A]; 8 NYCRR 200.1 [zz] [10]; see also 34 CFR 300.8 [c] [9].)
The foregoing conditions cannot be represented by isolated incidents. “[T]he student must manifest the characteristic(s) ‘over a long period of time and to a marked degree that adversely affects a student’s educational performance.’ ” (Mr. N.C. v Bedford Cent. Sch. Dist., 300 Fed Appx 11, 12 [2d Cir 2008]; 8 NYCRR 200.1 [zz] [4].)
Petitioners argue that the SRO erred in his determination to uphold the IHO’s findings that J.T. did not have a disability.
In support of their argument, they cite to the holding in Muller on Behalf of Muller v Committee on Special Educ. of E. Islip Union Free Sch. Dist. (145 F3d 95 [2d Cir 1998]). In the Muller case, the court overturned a lower determination of nondisability. The court noted that “the regulation [8 NYCRR 200.1 (mm) (4) (iii)] does not require that the student be clinically or medically depressed but only that [he/she] exhibit a ‘generally pervasive mood of unhappiness or depression.’ ” (Id. at 104.) We find the Muller case readily distinguishable from the matter sub judice. The child in Muller had attempted suicide and “nearly every doctor and psychologist who examined [the child] noted in his or her report that [the child] exhibited symptoms of depression.” (Id.) Additionally, the child in the Muller case had exhibited instances of aberrant behavior such as “suicide attempts, . . . arson attempts, . . . lies, cutting classes, failure to complete homework, stealing things, quitting the basketball team, . . . defiance, poor grades and academic performance.” (Id.) We cannot help but contrast this with the testimony received at J.T.’s IHO hearing and to hear him/her described as well behaved and age appropriate. The negative *247 incidents (e.g., J.T. starting to hit his/her sister) detailed by petitioners’ counsel in his excellent memorandum of law are subsumed and overcome by the (thankfully) positive comments concerning the child’s development and experiences at the respondent District which placed him/her in the top half of his/ her class (tr at 101).
Petitioners also draw the court’s attention to the case of Matter of Board of Educ. of Bay Shore Union Free School Dist. v Thomas K. (14 NY3d 289, 291 [2010]) for the proposition that ADHD is “other health impaired” pursuant to Education Law § 4401 (1). A close reading of the Thomas K. case demonstrates that it is of limited utility. The Thomas K. Court concerned itself with a discussion of the sufficiency of the Individualized Education Program (hereinafter referred to as IEP) of the student and whether the aide detailed under the IEP had to be sent to a private rather than a public school. (Id. at 291.) The decision does not concern itself with, nor does it mention save in passing, the classification procedure itself.
Petitioners have an interesting argument on the difference between “educational performance” and “academic performance,” and claim that the SRO impermissibly focused on J.T.’s academic standing to wrongfully deny him/her the classification of disability. It is conceded that New York has not defined “Educational Performance” (A.J. v Board of Educ.) In the A.J. case, the student’s “teachers reportedly indicated that A. J. was ‘fine’ academically, but that his [/her] behavior was disruptive, compulsive and all-consuming.” (Id. at 302.) The A.J. court opined: “The Court recognizes that the proper interpretation of the phrase ‘educational performance’ is a difficult issue, borne out by the multitude of scholarly articles that have been written on the subject.” (Id. at 308.) The court then proceeded to analyze two Second Circuit cases which lent guidance to the question. (Mr. N.C. v Bedford Cent. Sch. Dist., 300 Fed Appx 11 [2d Cir 2008]; C.B. ex rel. Z.G. v Department of Educ. of City of N.Y., 322 Fed Appx 20 [2d Cir 2009].)
Referring to the Mr. N.C. case, Judge Hurley quoted directly:
“Even if M.C. did satisfy one or more of the five emotional disturbance characteristics, he still would not qualify as emotionally disturbed because there is insufficient evidence that M.C.’s educational performance was adversely affected by any such condition. See N.Y. Comp. Codes R. & Regs, tit. 8, § 200.1(zz) (4); see also 34 C.F.R. § 300.8(c)(4). *248 M.C. did not fail any of his classes at Fox Lane High School . . . , the public school he attended in the Bedford Central School District .... Cf. Muller ex rel. Muller v. Comm. on Special Educ., 145 F.3d 95, 103 (2d Cir.1998) (addressing child who ‘failed multiple subjects in the seventh and eighth grades); New Paltz Cent. Sch. Dist. v. St. Pierre ex rel. M.S., 307 F.Supp.2d 394, 399 (N.D.N.Y.2004) (discussing a student who ‘received three failing grades in the 9th grade’). From ninth grade to tenth grade, M.C.’s grade-point average (‘GPA’) declined only nine points. Cf. New Paltz, 307 F.Supp.2d at 399 n. 11 (observing a GPA decline of 18.26 points). And we cannot conclude on the basis of the record here that this decline was attributable to an emotional disturbance as opposed to M.C.’s acknowledged drug use” (id. at 308-309, quoting Mr. N.C. at 13).
Turning to the C.B. ex rel. Z.G. decision, the A.J. court quoted:
“Neither party contests that ADHD and bipolar disorder could qualify as disabling conditions. The question is whether Z.G.’s experience of those conditions adversely impacted her educational performance. Z.G.’s grades and test results demonstrate that she continuously performed well both in public school before she was diagnosed, and at the Dalton school thereafter. The DOE’s psychoeducational assessment and a psychological evaluation requested by plaintiff concur in finding that Z.G. tested above grade-level and do not opine that Z.G.’s educational performance has suffered. While Z.G.’s treating psychiatrist and teacher at Dalton testified to their observations of Z.G.’s difficulties with bipolar disorder and ADHD, there was a continuity of Z.G.’s successful performance both before and after her conditions were diagnosed. The evidence on record is insufficient to show that Z.G. has suffered an adverse impact on her educational performance.” (Id. at 309, quoting C.B. ex rel Z.G. at 21-22.)
Based on the foregoing, this court is moved to conclude, as did the court in A.J., that “educational performance” must be “assessed by reference to academic performance which appears to be the principal, if not only, guiding factor.” (Id. at 309.) This and the other factors related by the SRO in his decision, which *249 we described supra, all point to an inescapable conclusion: J.T. was neither “emotionally disturbed” nor “other health impaired” for the purposes of the IDEA. The finding of the SRO is clearly supported by a preponderance of the evidence. Moreover, assuming, arguendo, that J.T.’s mental and emotional state did rise to the level of emotional disturbance and/or other health impairment, the SRO was correct to find that these did not affect J.T.’s educational performance. He/she was simply performing at too high a level to be considered otherwise. (See District’s exhibits 6-10.) We have considered all of the parents’ exhibits and they do not disturb this finding.
The court will consider if the SRO erred in rejecting petitioners’ argument that the District violated the “Child Find” obligation under the IDEA by not recommending special services after receiving Dr. Stavrou’s report.
“The ‘Child Find’ provisions of the IDEA establish that the state must have ‘policies and procedures to ensure that’ ‘[a]ll children with disabilities . . . in need of special education and related services [ ] are identified, located, and evaluated and [that] a practical method [must be] developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.’ ” (Handberry v Thompson, 446 F3d 335, 347 [2d Cir 2006]; 20 USC § 1412 [a] [3] [A].)
In order for a school district to be held in violation of this provision of the IDEA, the school must have a reason to believe that the student might be suffering from a disability and should therefore convene a CSE meeting to address that possible disability (New Paltz Cent. Sch. Dist. v St. Pierre ex reí. M.S., 307 F Supp 2d 394 [ND NY 2004]; see Scarsdale Union Free Sch. Dist. v R.C. ex reí. R.C., 2013 WL 563377, 2013 US Dist LEXIS 21194 [SD NY, Feb. 4, 2013, No. 12-CV-1227(VB)]).
In the matter at hand, it is readily apparent that the District had a procedure to recommend students to the CSE if a disability was suspected. Petitioners’ contention is that Dr. Stavrou’s report should have triggered another CSE meeting. We agree with respondents, however, that the SRO reviewed Dr. Stavrou’s report and properly concluded that its information “did not vary greatly from the information previously considered by the August 2011 CSE” (SRO decision at 17).
The petitioners’ last claim is that the SRO incorrectly failed to overturn the IHO’s decision to deny reimbursement for J.T.’s *250 tuition to parochial school. It is beyond cavil that the IDEA “includes the power to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act.” (School Comm. of Burlington v Department of Ed. of Mass., 471 US 359, 369 [1985].) In order to impose such a burden on the District, the parents’ request for reimbursement “will be granted only if (1) the proposed IEP failed to provide the student with an appropriate public education; (2) the parents’ private placement was appropriate to the child’s needs; and (3) equitable considerations support the parent’s claim.” (Hardison v Board of Educ. of the Oneonta City Sch. Dist., 773 F3d 372, 376 [2d Cir 2014].) We agree with the SRO’s determination that the petitioners have failed to satisfy the first criterion because J.T. was found not to be suffering from a disability. To consider the remaining factors would be purely academic and speculative.
Under the facts presented herein, in order for petitioners to prevail, being bullied in and of itself would have to constitute a disability. No reasonable interpretation of statute, regulation or case law permits such a result. It is for the legislature, not this court to make such a declaration.
Accordingly the application to set aside the determination of the SRO is denied and the petition is dismissed.

 The court uses the terms his/her or he/she in referring to J.T. to protect the privacy of the child involved as much as possible. Quotations have been modified where necessary for the same purpose.